[No. G032479. Fourth Dist., Div. Three. Sept. 24, 2004.]

MARK HURWITZ, Plaintiff and Respondent, v.
CITY OF ORANGE, Defendant and Appellant.

**COUNSEL**

David A. DeBerry, City Attorney; Law Offices of Stephen M. McNamara and Stephen M. McNamara for Defendant and Appellant.

Law Offices of Hurwitz & Hurwitz and Michael J. Meade for Plaintiff and Respondent.

OPINION

SILLS, P. J.—

I.  Introduction: This Case is About a Party Trying to Take
Advantage of Its Own Wrong

This is a textbook example of a party trying to take advantage of its own wrong. In this case the opportunistic party is the City of Orange. The wrong is that the city violated a preliminary injunction not to build in a certain area or otherwise interfere with existing parking access enjoyed by a property owner. We will repeat the essence of that statement just in case any reader missed it the first time: *The city violated a preliminary injunction not to interfere with the landowner's parking access.* It built a permanent cement curb that the injunction specifically precluded it from building, thereby eliminating a driveway swale and thus entirely foreclosing the owner's access to a parking space on his property. Now the city complains because the trial court awarded the property owner damages for the loss of access.

Specifically, the city now claims on appeal that it should be immune from a condemnation award because instead of merely defending a condemnation proceeding brought by the city itself, the landowner should have also filed a proceeding in administrative mandate to . . . well, that's the problem—to obtain *what* relief? When deconstructed, the city is saying that the landowner should have brought an administrative mandate proceeding to *prevent* what the city had *already* done and to adjudicate what was going to be adjudicated in the condemnation proceeding already underway. If we were scorekeepers, the city's conduct might be graded this way: Plus 10 for chutzpah, minus 1000 for jumping the gun. Needless to say, the argument is unavailing and we shall affirm the judgment pursuant to the condemnation action awarding the property owner money for the interest taken by the city.

II.  Facts and Procedural History

A.  *The Property: A Guaranteed Parking Spot on a Traffic
Circle Surrounding a Charming Plaza Area*

The case centers on a condemnation action concerning a certain driveway (well, former driveway, it isn't there anymore) and parking area which is *on* the Orange Circle in Orange, California.

To paint the picture: The Orange Circle is a large traffic circle in an "old town" section of Orange. The area is redolent of California in the 30's, 40's and maybe 50's. (And clearly not the 60's or later.) It's a location perfect for

time travel movies, and in fact the location's credits include *The Man Who Wasn't There* (2000, set in 1949 Pasadena), *Big Mama's House* (2000, playing the role of generic small southern town), and a 1998 commercial using the Oscar Meyer Weinermobile (another appeal to nostalgia). Some scenes in *Forrest Gump* could easily have been filmed there as well.

The circle is created by the intersection of Glassell and Chapman Avenues, not unlike British roundabouts except that in the middle is a park-like plaza with green grass, a fountain, park benches, and trees around which the traffic swirls. There is heads-in parking on the circle for limited time periods.

There are a variety of businesses in the various quadrants. We are concerned with the city's plans for the southwest quadrant, which contains a Cuban restaurant, a coffee house, and, between the coffee house and the next building immediately to its north, a gap which forms a blind alley. The gap is wide enough to easily park a car *if* one could get to it without having to drive over the curb of a sidewalk. (The gap is actually long enough to accommodate two or three cars if one didn't care about all but one of them being blocked in.)[1]

Because of the curve of the circle, the sidewalk area near the coffee house and Cuban restaurant affords a relatively large sidewalk area for dining al fresco and coffee sipping. Today, in 2004, a patron nursing a nonfat iced-mocha half-decaf-cappuccino half-latte while sitting in a chair on that sidewalk would never think that, for a period extending from the 1920's to 2001, automobiles were able to traverse the current seating area so as to park in the gap, by way of a driveway swale cut into the sidewalk adjacent to the gap. The sidewalk then consisted of brickwork, and the driveway swale led into the circle itself. Today, using the gap for parking is impossible because there is a high curb where the driveway swale used to be, bolted-in city benches between the gap and the most direct path to the street, and more heads-in parking blocking the path a car might use to get in or out of the gap.

The gap of which we have spoken is actually part of the property on which sits a two-story 30's-ish style office building on the other side of the coffee house. The building is owned in fee by defendant and respondent Mark Hurwitz, who has had his law practice there since he was admitted to the bar in 1962. Hurwitz inherited the building from *his* father, also a lawyer, who practiced law in the building since he bought the property in 1946. There is no dispute in the record that during the 55 years from 1946 to 2001 the gap

---

[1] The owner of the gap, defendant and respondent Mark Hurwitz, expresses some sensitivity in his respondent's brief about the description of the land as an "alley," strenuously pointing out that it has never been used as a public thoroughfare. Fine. It is, though, the sort of blind alley that people are always turning into in car-chase movies.

could be used as a parking space. In fact, there is substantial evidence in the record (old photos of automobiles parked in the gap) that the gap was used as a parking space as early as the 1920's.

### B. The Parking Spot Is an Obstacle to the City's Plan to Make the Plaza Area Even More Charming

As alluded to above, enlarging the sidewalk area from the way it was and precluding automotive access from the gap across the sidewalk and into the public street that forms the circle makes eminent sense from both the point of view of diners and coffee-sippers, as well as the city. The diners have more space to enjoy their empanadas, paella, or chicken embajador outside in the fresh air; the coffee-sippers could delight in the additional open-air space gazing out upon the plaza inside the traffic circle over a comforting cup of java. And the city almost certainly gains extra sales-tax revenues from the additional business, as well as the general "yuppification" of the whole old town area: all very win-win-win except for Mr. Hurwitz, who loses access to his parking space (or, more precisely, the parking space that came with the building he inherited).

In December 1998 Hurwitz was visited by city officials (a service manager and planning manager) who told him of the city's plans for the southwest quadrant of the circle. He pointed out that he and his father had used the gap for parking with access to the city street since 1946.

Nothing happened then until September 1999, when the city sent a letter telling Hurwitz that if the city's plan for the area were approved, the driveway would be eliminated and he would no longer be able to park in the gap.

### C. The City Offers Nothing to Eliminate the Right to Use the Space for Parking

Negotiations between Hurwitz and the city took place over the next 10 months, but bogged down when the city insisted that Hurwitz had *no* valid claim for compensation. The city wanted to pay him nothing for the loss of the only guaranteed parking on the circle.

As part of these negotiations, in June 2000 an assistant city attorney sent Hurwitz a letter asserting that use of the gap for parking was *currently* unsafe, as well as would become more unsafe in the future. ("Vehicular access over a City sidewalk in a crowded pedestrian area is unsafe and will become increasingly more unsafe as more pedestrians are drawn to the area.") The assertion was made a full 10 months before the city would later take

matters into its own hands, and was in the context of the city's apologia to the effect that the loss of the ability to park in the space was of no value at all. The city in fact asserted that the renovations would "enhance the value of your property notwithstanding the inconvenience of losing one parking space."

As the trial evidence would later show, there had never been an accident, incident, or complaint regarding use of the gap for parking.

### D. *The Owner Files Suit to Prevent Loss of the Space and Obtains an Injunction Against Any City Interference, Including the Construction of a Curb*

In March 2001 Hurwitz got wind that the city was about to demolish the driveway and erect a curb in its place. On April 3 he filed a suit for an injunction to stop the city from depriving him of what he asserted was a valuable property right. After the hearing on April 20, the court issued a preliminary injunction on May 2, 2001, which by its express terms forbade the city, during the pendency of Hurwitz's action, from "directly or indirectly . . . [¶] Demolishing, blocking, barricading, commencing construction upon, eliminating or otherwise interfering with or depriving Plaintiff of the use of the driveway and/or Plaintiff's right of vehicular ingress and egress" in regard to the gap space.

On May 2 the parties modified the injunction to allow the city to do construction "not related to the closing of the driveway or construction of a curb."

### E. *The City Violates the Injunction and Goes Ahead and Builds a Permanent Curb Anyway*

In the latter part of May 2001 the city went ahead and, to use conclusory language, "interfered" with Hurwitz's ability to use the driveway and parking space anyway by building a curb. That is, the city constructed a new curb where the expanded sidewalk would be. It also bolted benches across the new sidewalk, making access from the street to the gap impossible. The city attempted to ameliorate what it had done by installing an "asphalt ramp" a few days after the construction of the curb. There is no dispute that this "asphalt ramp" was temporary and no longer exists. The record, in fact, discloses no evidence that it was ever *used* to afford access to the parking space, particularly given the bolted benches.

It was *after* this building project was completed that the city, in late June 2001, decided to hold a hearing to declare the use of the gap as a parking

space a "nuisance." The notice of the hearing, dated June 13, did *not* comply with the city ordinance concerning the content of notices of hearings on the abatement of nuisances. (Orange Mun. Code, § 8.04.080.) The notice required by the city ordinance is required to tell the property owner that *the hearing may be avoided* if he or she makes "the following corrections" and gives proof of those *corrections* to the satisfaction of the chief building official at least two days before the hearing. Obviously, as the trial judge would later impliedly find, the city was not interested in any "corrections" Hurwitz might make to his property. The city wanted to outright expropriate his use of the gap as a parking space by expediently declaring that his use was a "nuisance." At the hearing Hurwitz pointed out that the use of the property as a parking space had been accident free for at least 50 years. The city council, after hearing the opinions of its traffic engineer and its outside consultant that the use was a nuisance, adopted a resolution declaring it was a nuisance and directing the city attorney to institute eminent domain or nuisance abatement proceedings to "acquire" the "vehicular access" of the property.

### F. A Jury Awards the Owner Compensation in the City's Own Eminent Domain Case

In mid-July the city filed a cross-complaint in eminent domain in the ongoing action that Hurwitz filed in April seeking injunctive relief. The case came to trial in August 2002. The trial judge ruled that Hurwitz did not have to file a separate action in administrative mandate, that the use of the gap for parking was not a nuisance that the city could just summarily and unilaterally abate, and that Hurwitz should be compensated for the loss of the ability to use the space.

A jury determined the value of the property right taken. They were given only two choices. The city's expert came up with a figure of $1,000, based on the fair rental value of a parking space for one car at $10 a month, or $120 a year. Hurwitz expert's figure was $150,000, based on the decline in the value of the property from the loss of the parking space.

The city's lawyer made it very clear to the jury that there should be no compromise between the two figures: "you have two numbers, $1,000 and $150,000" and he was not about to "stand up here and talk about compromise, I'm not gonna talk about back peddling."

The jury did not compromise. It chose Hurwitz's figure and awarded $150,000. The city now appeals the judgment.

## III. Discussion

### A. *The City Erroneously Claims That the Owner Was Required to File an Administrative Mandate Action Before Any Compensation Could Be Awarded*

■ The city's primary argument is that the absence of an administrative mandate proceeding bars any compensation to Hurwitz. The argument fails for no less than four reasons.

#### 1. The City Is Estopped from Even Making the Argument

At its most basic, the city is *estopped* even to make the argument that Hurwitz's failure to bring administrative mandate action bars recovery, for two reasons.

##### a. *The Absence of Administrative Mandate Is the Direct Result of the City's Violation of the Preliminary Injunction*

First, the absence of an administrative mandate action was the direct result of the city's own violation of the preliminary injunction. To entertain the argument in the context of the facts of this case is to countenance the city's own lawlessness.

The order of events on the point is important: First, the city wanted, for a public purpose, to expand the sidewalk area of one quadrant of the Orange Circle. But that project had an unfortunate side effect: In the process it would destroy Hurwitz's driveway, and eliminate his ability to use the open gap on his property as a parking space. Second, the city did not want to pay Hurwitz anything for the loss of that use of his property. Third, negotiations stalemated. Fourth, the city then prepared to go ahead and expand the sidewalk and eliminate Hurwitz's use. Fifth, Hurwitz sought a permanent injunction to prevent loss of the use. Sixth, Hurwitz got a preliminary injunction forbidding the city from interfering with his space. Seventh, the city then went ahead and interfered anyway.

Then, eighth,—*after* the city had violated the preliminary injunction—it held a city council meeting to declare the property a nuisance. Hurwitz was provided notice of this meeting, but it was defective. In this city council meeting the result was a directive to the city attorney to take *legal action* to obtain the use of the space either by condemnation proceedings *or* by action to declare the use a nuisance.

Ninth, the city itself filed a condemnation proceeding, and in the process of *that* proceeding argued that Hurwitz should have brought an administrative mandate action and that its absence precludes, as a matter of law, any recovery of compensation in the very condemnation proceeding that it itself filed.

The city's conduct is a tissue of inconsistency. The city summarily "abates" a supposed "nuisance" before even the city declares it to exist! No wonder the trial court rejected the city's argument. The fact is that by violating the injunction *before* even making *its own* determination of nuisance, the city rendered any administrative mandate proceeding futile. The "nuisance" was already "abated" in late May before the city council took any action in June to, in essence, *ratify* what the cement contractors working on the sidewalk had already done.

The trial court found that the city did indeed violate the preliminary injunction, even though the city had added an "asphalt ramp" to the concrete curb. The trial court specifically noted that the injunction—even as modified on May 2—specifically precluded the city from constructing *any kind of curb*. Since the city now argues on appeal that it did not violate the injunction, a few words on that point are in order.

The city's premise is that it did not violate the injunction because it installed an "asphalt ramp" a few days after the permanent curb went up. The premise is incorrect. As the trial judge noted, the subject of the *building of a curb* was specifically included in the modification of the injunction on May 2.

And the trial judge was totally correct on the point. *Substantively*, the injunction clearly (by the use of the general words "indirectly" and "interfere") precluded the city from changing the *existing configuration* of Hurwitz's *access to the public street*. A permanent concrete curb plus an "asphalt ramp" with benches in front of it does not equal the permanent driveway swale that it displaced. The injunction by its plain terms precluded any interference with Hurwitz's existing right, even "indirectly." The city could not comply with the injunction by adopting a policy of "interfered with but equal." The plain language of the injunction was, "hands off."

Moreover, an "asphalt ramp" over a longer sidewalk and higher permanent curb is substantively different from a "swale" which is part of the sidewalk. The bolted park benches made any ingress or egress impossible. For a *pedestrian*—say someone who has just finished her biscotti and decaf mocha and is contentedly ambling back to one of the two- to three-hour public parking lots about a block away (assuming she was lucky enough to find parking there to begin with)—there would be no warning that she was about

to cross a part of the sidewalk where a car might pull out in front of her save a temporary "asphalt ramp" not integrated into the structure of the sidewalk. By the same token a driver backing out of the space would face a situation where pedestrians would not be as aware of the use of the space as a driveway as they would have been if the property remained unaltered.

The city clearly violated the injunction. The city therefore cannot now claim that Hurwitz did not exhaust his administrative remedies by filing a court action to prevent what it had already done.

> b. *The City's Own Filing of a Condemnation Action Is Inconsistent With the Theory That an Administrative Mandate Action Should Have Been Filed*

At the June hearing the city council authorized the *acquisition* of the ability to park in the gap by *either* a condemnation proceeding *or* a proceeding to abate a nuisance. While the trial court "suggested" the former, it ultimately was the city itself that decided to proceed by condemnation, not nuisance.

There can be no question that in making this election the city took a position fundamentally at odds with any need to file an administrative mandate proceeding. As we explain below in parts III.A.2. and III.A.3. of this opinion, the whole point of the common law requirement of filing an administrative mandate action before seeking damages in inverse condemnation is to give a government entity one last chance to revise or reverse course so that the taxpayers do not incur any unnecessary liability. The cases stress that the doctrine arises out of the need for agencies to be able to plan their budgets.

But in filing an action in *condemnation* after violating a preliminary restraining order, the city itself was saying: "We don't care if the gap was a nuisance, we want that right and will pay what it is worth." *That* particular choice was so fundamentally inconsistent with the idea that an administrative mandate action filed in order to deter the city from action which would cost its taxpayers money that it constitutes an estoppel.[2]

---

[2] We do not style the inconsistent action as a "waiver" because, as we discuss in part III.A.4. of this opinion, the city didn't want to *waive* its right to assert the need for an administrative mandate action; it wanted to keep back that particular litigation tactic as a trump card. That is why the city bitterly complains in its briefs that it should not be penalized for taking the trial judge's "suggestion."

## 2. The Owner Complied with the Substance of the Administrative Mandate Requirement In Any Event

The second reason supporting estoppel is that Hurwitz's action to obtain a permanent injunction was, *in substance*, an administrative mandate action. That is shown by an examination of the main case on which the city primarily relies in this appeal, *Rezai v. City of Tustin* (1994) 26 Cal.App.4th 443 [31 Cal.Rptr.2d 559].

Factually (as we show in more detail below) *Rezai* has nothing in common with this case. *Rezai* was a permit denial case, not a summary abatement of nuisance case.

However, *Rezai* does contain a helpful discussion on the nature of the "requirements" for filing an action in administrative mandate under section 1094.5 of the Code of Civil Procedure. (All further statutory references are to that code.) The point is simple. Before the taxpayers should have to pay good money for some kind of "taking" action by an administrative agency (or local government entity), the government agency (or entity) should have the chance to mend its ways and stop short of the costly undertaking. In essence there should be one last chance for a court to yell halt and save the taxpayers from the burden of incurring a debt that might still be prevented. That is the basis of the doctrine of exhaustion of administrative remedies in this context—give the government a chance to remedy its land use determination without paying money. It is the thrust of a long passage in *Rezai*, quoting *Agins v. City of Tiburon* (1979) 24 Cal.3d 266, 276 [157 Cal.Rptr. 372], salient parts of which we shall also quote now:

" '[Speaking of inverse condemnation's chilling effect:] "This threat of unanticipated financial liability will intimidate legislative bodies and will discourage the implementation of strict or innovative planning measures . . . . Determining that a particular land-use control requires compensation is an appropriate function of the judiciary, whose function includes protection of individuals against excesses of government. But it seems a usurpation of legislative power for a court to *force compensation. Invalidation, rather than forced compensation*, would seem to be the more expedient means of remedying legislative excesses." ' " (*Rezai, supra*, 26 Cal.App.4th at p. 449, italics added.)

The *Rezai* court also went on to quote *Air Products Quality, Inc. v. State of California* (1979) 96 Cal.App.3d 340, 352 [157 Cal.Rptr. 791] as eschewing the same idea in these words: " 'Compelling public policy relating to fiscal planning and the integrity of the public fisc dictates that a party who claims to be aggrieved by wrongful action of an administrative agency . . . be

required to seek mandate to *compel the agency to set aside* its action and thus *prevent injury* before maintaining a damage action on the theory of inverse condemnation . . . .' " (*Rezai, supra,* 26 Cal.App.4th at p. 449, italics added.)

The trial judge specifically observed that there was nothing to be gained by Hurwitz's filing an administrative mandate action, an observation which is substantively unassailable. Remember, Hurwitz had already filed *in April* for an injunction to prevent the city from doing what it, in fact, did—change the sidewalk configuration to make use of his parking space impossible. The city built the curb in May, and the city council did not declare a nuisance until June, and even then the authorization was to *acquire* the property, by *either* a condemnation action or its own nuisance action. The *city* chose to acquire by a condemnation action.

So what could an action in administrative mandate brought by Hurwitz have accomplished that either Hurwitz's original action or the city's condemnation action could not? An injunction not to do what the city *had already done* in violation of an earlier injunction? The whole point of the need to bring an administrative mandate action is to *prevent* the city from physically taking property by court order so there is no need for the taxpayers to pony up for an avoidable mistake: A mandatory injunction at that stage would have required tearing up an existing curb and restoring a parking and driveway configuration consigned to history. There is no way, for example, that Hurwitz might have brought an administrative mandate action and won without the sound of jackhammers.

In *first* filing an action for an *injunction*, Hurwitz did, in fact, exactly what the common law requirement of filing in administrative mandate was designed to make him do: Prevent the city from taking action that would otherwise make it liable to pay money. If the city wanted to reverse course to avoid payment of damages, it had every chance to do so in Hurwitz's own action for an injunction. It was not Hurwitz's fault that the city violated the court order that Hurwitz obtained in that action.

### 3. There Is a Well-Established Exception to the Requirement for an Administrative Mandate Action When an Irrevocable Taking Has Already Occurred

The common law requirement of filing an administrative mandate action does not apply where the government entity goes ahead and physically takes the property. (See *Leppo v. City of Petaluma* (1971) 20 Cal.App.3d 711 [97 Cal.Rptr. 840]; see also *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 13 [32 Cal.Rptr.2d 244, 876 P.2d 1043] [dicta that "When property is

damaged, or a physical invasion has taken place, an inverse condemnation action may be brought immediately because an irrevocable taking has already occurred"].)

*Leppo* is on point and applies to the case before us a fortiori. There, a one-story structure abutting the subject building was demolished, leaving the north wall of the subject structure, a 100-year-old hotel building, exposed. (*Leppo v. City of Petaluma, supra,* 20 Cal.App.3d at p. 715.) The city building inspector and engineer then concluded that the exposed structure was unsafe for occupancy. The owners and the occupants of the hotel disagreed. The city issued a letter to the owners the thrust of which was: Demolish the building yourself or we will do it for you. Then there was a city council meeting at which the building was declared a public nuisance, and a contractor got the job to demolish the building. *Without first obtaining a judicial determination that the property was a nuisance,* the city's contractor went ahead and demolished the building about two months later. In the aftermath of that demolition the owners instituted an action for damages, which resulted in an award. (*Ibid.*)

The city, on appeal, contended that the owners should have brought an action in administrative mandate under section 1094.5 to prevent the demolition. (*Leppo, supra,* 20 Cal.App.3d at p. 716.) The court rejected the argument for two reasons. One, similar to the estoppel point we have already made, the *Leppo* court pointed out that the city could hardly "complain" that the owners did not avail themselves of "an earlier remedy which" the city itself "had decided to forego." (*Ibid.*) In that regard the court would observe, some nine paragraphs later in the opinion, that to "shift to the property owner" the "burden of proving that his demolished building was in fact not a public nuisance would be to vitiate the requirement" of the California Constitution that no person be deprived of property without due process of law. (*Leppo, supra,* 20 Cal.App.3d at p. 718.)

The second reason was that a property owner is under no duty to bring an action to restrain the "threatened wrongful destruction" of the property. (*Leppo, supra,* 20 Cal.App.3d at p. 717, citing *Moll Co. v. Holstner* (1934) 252 Ky. 249 [67 S.W.2d 1].)

Let's do some thinking about *Leppo.* We first should recognize that there indeed is a tension between the idea that a property owner can sit back and let a city destroy property after it has made a clear threat to do so and then bring an action for damages, and *Rezai*'s point (relying on a quotation from our high court's opinion in *Agins,* a higher authority than the Ohio court) that the taxpayers should not bear *preventable* consequences.

In this case we need not, and do not, go as far as the *Leppo* court did. In *Leppo* the owners of the hotel did indeed have a short opportunity to prevent the demolition of their property—they had about two or three months to file suit between the city council meeting in June declaring the property a nuisance and the ultimate demolition in September. (See *Leppo, supra,* 20 Cal.App.3d at p. 715.) The court still excused the owners' inaction.

Here, however, there was no gap at all into which the landowner might have leapt to *prevent* the city's action. Unlike in *Leppo,* the property owner had no opportunity *whatsoever* to prevent the wrongful demolition of the sidewalk driveway swale; in fact the city acted despite an injunction—but that fact only favors the property owner here, as distinct from *Leppo.* In fact, Hurwitz was proactive to the extent that he investigated and found out that the city was planning to begin the project in April 2001, so he filed for injunctive relief. He did not waste any time. Thus to the degree that the reasoning in *Leppo* may not adequately account for, or recognize, the public policy of preventing expensive mistakes to be borne by the taxpayers—the policy that animates the need to file an administrative mandate action in the usual case—that failure in *Leppo* does not apply here. Hurwitz *got* an injunction against the city interfering with his existing ability to park; the city just disobeyed it.

*Rezai,* on which the city relies, is not factually apposite. That was a permit case, not a jump-the-gun-unilateral-nuisance-abatement case. In *Rezai,* a property owner obtained a permit after a public hearing to construct an 11-unit apartment complex. (*Rezai, supra,* 26 Cal.App.4th at p. 447.) Unfortunately for him, he had failed to give proper notice of the hearing to several property owners who were entitled to notice. (*Ibid.*) So his permit was revoked, and after a properly noticed hearing and related appeals process, the end result was that he had to settle for a scaled-back project. (*Id.* at p. 448.) He then filed a claim for "damages" based on the revocation of the original permit, and the fact he got stuck with a scaled-back project, which he contended was a taking. (*Ibid.*) When the claim was rejected by the city, he sued for damages, as distinct from filing an action in administrative mandate.

The trial court granted the city judgment on the pleading for failure to exhaust administrative remedies by not filing an administrative mandate action, and this court affirmed. (*Rezai, supra,* 26 Cal.App.4th at p. 453.) Our point was that the owner could have prevented any damages from a wrongful taking by suing in administrative mandate (well, assuming the city actually obeyed any injunction which the property owner might have obtained in such a hypothetical action!), and the taxpayers should not have to absorb such a preventable financial loss. (*Id.* at pp. 448–450.) The rule of the case obviously has no application in a situation where the physical invasion or demolition has already occurred.

*Patrick Media Group, Inc. v. California Coastal Com.* (1992) 9 Cal.App.4th 592 [11 Cal.Rptr.2d 824], relied on almost as heavily by the city as *Rezai*, also provides an instructive contrast to the facts here. *Patrick Media* is an example of the way the administrative exhaustion requirement is supposed to work.

In *Patrick Media*, a landowner wanted to develop a large hotel complex, and one of the conditions placed on the development of the complex was the elimination of three billboards on the property, which had been leased to an advertising company. (*Patrick Media, supra,* 9 Cal.App.4th at p. 599.) The advertising company simply filed an action in inverse condemnation without first (or, as the court pointed out it might also have done, simultaneously) filing an action in administrative mandate. (*Id.* at pp. 600–601.) That absence was fatal for the same policy reasons that we have already noted in *Rezai*: The administrative agency should have the right to modify or retract its decision so as not to force on the taxpayers unneeded expense. (*Id.* at pp. 612–613.) We quote the key passage to that effect in the margin.[3] In *Patrick Media*, as the appellate court pointed out, *if* an administrative mandate action had been brought, the agency might have reconsidered the condition of elimination of the billboards. (*Patrick Media, supra,* 9 Cal.App.4th at p. 612.)[4]

---

[3] "A public agency's capacity to plan its actions in the public interest and to make reasonable and responsible allocations of resources that it holds in trust for the public requires that the agency be alerted promptly both when its decisions are questioned and when, as a result of a particular decision, the agency may be liable for inverse condemnation damages. If an agency operating with limited resources may be liable for inverse condemnation damages as a result of a particular decision, the agency must be afforded an opportunity to change or stay enforcement of the challenged action, remove or modify a challenged condition, or take other action to mitigate the claimed damages if it determines enforcement of its order does not merit the compensation required to be paid." (*Patrick Media, supra,* 9 Cal.App.4th at pp. 611–612.)

[4] *Patrick Media*, as did the case it primarily relied on, *Rossco Holdings Inc. v. State of California* (1989) 212 Cal.App.3d 642 [260 Cal.Rptr. 736], stands for a fine point in regard to the need to bring an administrative mandate action which, though academic for the present case, should be noted. In *Patrick Media*, the advertising company made the argument that since it was not challenging the validity of the elimination-of-billboards condition, there was no need for an action in administrative mandate. The *Patrick Media* court refuted the argument with a fairly sophisticated bit of metaphysics: The essence of the challenge to the agency's action was not *just* the requirement of the elimination of billboards, but was also, necessarily, to the elimination of billboards without the payment of just compensation. (See *Patrick Media, supra,* 9 Cal.App.4th at p. 608, citing *Rossco Holdings Inc. v. State of California, supra,* 212 Cal.App.3d 642, 660.) The degree to which this parsing represents finding a distinction where there is no substantive difference may be left for another day. In the case before us, the administrative action was taken after the city had already violated a court order and in doing so effected a physical taking of the property right. In *Patrick Media*, if the decision was improvident and the court in an administrative mandate proceeding was going to give the agency a chance to reverse or modify its course (in the court's phrase, "mitigate damages," see *Patrick Media, supra,* 9 Cal.App.4th at p. 612), then the agency could have reversed its

The city here recognizes the existence of an exception to the necessity of bringing administrative mandate proceedings when a physical taking has been effected. But, the city argues that the exception does not apply because the city did not effect a "physical" taking, rather it only took "intangible" property. The theory is that the city owned the curb, not Hurwitz, and had a right to construct on its property what it saw fit. Therefore the city did not *physically* take anything from Hurwitz because Hurwitz only had "intangible" parking rights, and the city "re-established access" for parking by building the "asphalt ramp."

The city's argument fails in its premises. If it takes a jackhammer and concrete to "put it back the way it was," it is manifestly a physical taking or invasion.

To demonstrate that point, let's contrast the actions which a hypothetical injunction would have imposed on the cities in *Leppo*, *Rezai*, and *Patrick Media*. In *Leppo*, and all the more so in *Rezai* and *Patrick Media*, an injunction issued in a hypothetical administrative mandate action could have been complied with by the city or agency with the *mere stroke of a keyboard*: A revocation of the contract in *Leppo*, the issuance of a permit equal to the original permit in *Rezai*, or the deletion of the elimination-of-billboards condition in *Patrick Media*.

Here, by contrast, a hypothetical injunction would have required the city to (a) tear up a flat concrete sidewalk—one can almost hear the piercing annoyance of jackhammers breaking up the cement; (b) demolish the permanent concrete curb in front of the gap as well as the now nonexistent "asphalt ramp" that theoretically allowed a car to pass over it (more jackhammering); (c) re-stripe the area of the street in front of the gap so that it was clear no one should park there (i.e., applying some paint to the asphalt of the street); and (d) in place of the demolished concrete sidewalk build a driveway swale of the same dimensions as the one previously enjoyed by Hurwitz (a job that is going to require more concrete and cement). Those seem like pretty *physical* actions to us.

### 4.   The City Abused the Nuisance Power

Three reasons to reject an argument are usually more than enough. We would not mention the next reason except that the city itself forces us to do so in its briefing. The background is this: In June, after the city council meeting was held to declare the use of the gap on Hurwitz's property for

decision in the two-dimensional world of paper. In the present case, by contrast, reversal would have been a literal physical restoration of a driveway swale.

parking a nuisance, the trial judge "suggested" that the city file a condemnation action, which it did. We have already alluded to the estoppel effect created by the city's voluntary agreement with that suggestion: The city can hardly now complain that a court made a "condemnation award" in a condemnation action, which *it* filed.

In its briefs, however, the city now asserts that it should not be *penalized* for having followed the trial court's suggestion.[5] The city's anti-penalization theory goes like this: The city could have brought a straight-up nuisance abatement action, and it was only pressure from the trial court that prompted the city to select condemnation as its preferred remedy. Moreover— continuing on with the theory—if the city *had* brought a nuisance abatement action, the trial court would have been obliged to declare that the use of the space was indeed a nuisance, because the city council had the testimony of a traffic consultant at the June meeting who duly gave the opinion that the use of the parking was a safety problem, and that particular finding by the city council would itself preclude any condemnation damages, because the "taking" was nothing more than the abatement of a nuisance, and a property owner doesn't get compensation merely for removing a nuisance.

There is a central flaw in this theory. It assumes that local public entity determinations of nuisance are absolutely immune from judicial scrutiny, such that even a transparently flimsy, transparently *pretextual* finding of nuisance would be enough to immunize the entity from any obligation to pay compensation.

That is simply too broad a model of nuisance law. And, if there ever was a case where a city's finding of "nuisance" could be found by a trial court to be pretextual (as a cover for the substantive taking of property, or as here, a property right), this is it. To repeat the litany: The salient facts before the trial court were that the city (1) had taken no action on the parking spot as a nuisance for over 50 years; (2) *first raised the issue in negotiations in the context of a work of public improvement*; (3) failed to assert the theory that the space was a nuisance when the landowner sought a court order preventing interference with it; (4) violated that court order; and *only then*—about a

---

[5] From page 33 of the appellant's opening brief: "The trial court's decision [that a writ of mandate action was not required] is especially egregious to the City and its taxpayers because it was the trial court that suggested the City file the condemnation action in the first place. *But for* the trial court's direction, the City need not have filed a condemnation action in light of the City Council's finding of nuisance." (Italics added.) And from the reply brief, page 6, footnote 3: "The Court is asked to recall that the eminent domain action was begun at the suggestion of the trial court. The city's desire to cooperate should never have been used against it, yet it was, in what can arguably be described as a violation of the City's Due Process rights."

month later—; (5) formally declared the use of the space to be a nuisance, a use which had *already* been discontinued by virtue of the city's violation of a court order. Thus in *substance*, the sequence shows that the city was not using its police power to abate a nuisance. Rather, it was trying to use its power to abate nuisances as a fig leaf to hide the rather naked expropriation of an existing property right.

■ We need only add that there is precedent for the point that a public entity cannot mask what is *substantively* a taking merely by invoking its nuisance power. We have already discussed the *Leppo* case, directly on point, where the court awarded damages after a city preemptively demolished a building as a nuisance.

The issue has often arisen in First Amendment cases, where cities have used their power to regulate land use in order to ameliorate secondary effects of adult businesses, with the adult businesses claiming that the regulations were a pretext for censoring speech. (See *Young v. American Mini Theatres, Inc.* (1976) 427 U.S. 50 [49 L.Ed.2d 310, 96 S.Ct. 2440]; *City of Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41 [89 L.Ed.2d 29, 106 S.Ct. 925]; *Arcara v. Cloud Books, Inc.* (1986) 478 U.S. 697 [92 L.Ed.2d 568, 106 S.Ct. 3172].)

Usually the adult businesses lost (because the regulations really were directed at secondary effects and not the "speech"), but in the process of the evolution of the case law, the idea that nuisance abatements could indeed be pretexts for suppressing speech took hold. It began at least as far back as Justice Powell's concurrence in *Young v. American Mini Theaters, Inc.*, *supra*, 427 U.S. 50, where he opined that "courts must be alert to the possibility of direct rather than incidental effect of zoning on expression, and especially to the possibility of using the power to zone as a pretext for suppressing expression." (*Id.* at p. 84.) And by the mid-1980's, in *Arcara, supra*, 478 U.S. 697, the entire federal Supreme Court appears to have considered at least the *danger* of pretext as a ground for inquiry into the city's action. There, the court rejected an adult book store's claim that the store had merely been declared a public health nuisance as a pretext for expunging undesired speech, but—importantly—did so *not* by categorically saying that courts could not inquire into the bona fides of nuisance findings at all, but simply by noting that there was no evidence to suggest a pretextual motivation. (See *id.* at p. 707, fn. 4.) And Justice O'Connor, in her concurring opinion, directly allowed that evidence of pretext might have made a difference. (*Id.* at p. 708 (conc. opn. of O'Connor, J.).)

Similarly, on our own high court, Justice Mosk made the same point in his concurring and dissenting opinion in *City of National City v. Wiener* (1992) 3 Cal.4th 832 [12 Cal.Rptr.2d 701, 838 P.2d 223], when he said, "I do not mean to sanction the use of . . . the common law of nuisance as a pretext for ridding a community of First Amendment-protected activity. The federal high court has also cautioned that it would take a dim view of any such action." (*City of National City, supra*, 3 Cal.4th at p. 859, fn. 12 (conc. & dis. opn. of Mosk, J.).)

We see no reason to restrict pretext inquiry to just the adult bookstore cases, particularly in light of the wide variety of contexts in which the federal high court has enunciated a need for pretext inquiry (see *Waters v. Churchill* (1994) 511 U.S. 661, 690–691 [128 L.Ed.2d 686, 114 S.Ct. 1878] (conc. opn. of Scalia J.)). Commentators have noticed there can, in some cases, be an almost imperceptible segueway from a city's power to abate a nuisance on the one hand to a city's taking property for public use on the other. (See generally Frazier, *Protecting Ecological Integrity Within the Balancing Function of Property Law* (1998) 28 Envtl.L. 53, 91–92.)

Moreover, as early as *Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393 [67 L.Ed. 322, 43 S.Ct. 158], the United States Supreme Court held that there could indeed be times when the ostensible abatement of a nuisance would be, in effect, a *taking*, requiring compensation. (See *id.* at 415.) By the late 1970's, *Penn Central Transp. Co. v. City of New York* (1978) 438 U.S. 104, 105 [57 L.Ed.2d 631, 98 S.Ct. 2646], the high court was clear that a city's conclusion that an area is a nuisance is not absolute and could be challenged on its bona fides, especially in situations where the ostensible abatement of a nuisance coincidently confers a broader public use which otherwise might be the subject of compensation. (*Ibid.*)

We emphasize that it is hard to imagine that many eminent domain cases beyond this one will involve pretextual nuisance issues, but this case is extraordinarily unusual in that the evidence of nuisance-as-pretext is unavoidable. We have already noted how the sequence of events—first take the use of the property for a public purpose, then claim nuisance as a justification—makes virtually no other explanation reasonable.

> B. *The City Wrongly Claims That the Evidence of the Property's Value Violated Evidence Code Section 822, Subdivision (a)(6)*

The evidence at the condemnation trial was divergent, to say the least. The city's expert asserted that the loss of the ability to use the property for parking was worth $1,000 based on a putative $10 a month for parking

nearby. Hurwitz's expert asserted it was $150,000 based on the fair market value of the property with, as compared to without, the ability to use the space for parking.

On appeal the city argues that the methodology used by Hurwitz's expert was fatally flawed because the expert used, in figuring the value of the building in the "before" condition, a capitalization rate of 8 percent on a net operating income of some $180,000 a year. (The figure was $2.1 million *with* the parking space and $2.1 minus $150,000 without.) That is, an investor figuring on buying the building as an investment (and taking into account necessary repairs to make the property, particularly the currently unused second floor, operable, as well as a 35 percent vacancy rate and 5 percent for collection losses) would expect an 8 percent return on the investment.

The city makes a preliminary glancing attack on the expert by saying that the income approach was inappropriate because the building does not generate any income. But that hardly precludes using an income approach as a matter of law. Most, perhaps all, properties can be valued by looking at the sorts of considerations in which an investor would engage. Even if you live in your own house, for example, one way of calculating its value is to look at it from the point of view of an investor who would buy it to rent it out. The mere fact that Hurwitz does not *currently* rent out property he uses for his own law offices hardly proves that he could not sell it to an investor who might want to rent it out.

The core of the city's attack is a supposed violation of section 822, subdivision (a)(6) of the Evidence Code. The city relies on the statute to contend that the trial court erred in allowing Hurwitz's expert to testify to an 8 percent capitalization rate based on the expert's own general experience. (The expert was *not* allowed to testify that he arrived at the figure by a general market survey and looking at "various properties and sales.") The expert ended up saying that the figure was based on his own 25 years of experience.

Now we quote Evidence Code section 822, subdivision (a)(6) in full: "(a) In an eminent domain or inverse condemnation proceeding, notwithstanding the provisions of Sections 814 to 821, inclusive, the following matter is inadmissible as evidence and shall not be taken into account as a basis for an opinion as to the value of property: [¶] . . . [¶] (6) The capitalized value of the income or rental from any property or property interest *other than* that being valued."

■ The statute is a protection for property owners, not condemning entities. As noted by *People ex rel. Dept. of Water Resources v. Andresen* (1987) 193 Cal.App.3d 1144, 1165 [238 Cal.Rptr. 826], "The purpose of Evidence Code section 822 is to prevent introduction into evidence of *particular acquisitions of similar properties by the condemner itself.* The parties are to focus instead on the market value of the property at the time of condemnation." (Italics added.)

The city's argument, taken to its logical conclusion, is that the income method of valuation, which by its nature requires *some* capitalization rate, can never be used in condemnation proceedings, a point that quickly devolves to absurdity. If, as the city contends, a capitalization rate based on a generic 25 years of experience runs afoul of the statute, then nothing but a random or even whimsical basis for a capitalization rate would suffice. We would have the anomaly that the accumulated knowledge of an appraiser over the course of his or her career as to what investors would expect would be inadmissible, but if the expert determined the capitalization rate by throwing darts or flipping a coin or even opening a book at random, *that* would be admissible.

■ The statute should not be construed so absurdly. Its text should not be added to. As long as an expert does not rely on particular and identifiable acquisition, the statute is not offended. Any other result transforms the statute into an a priori bar to the use of the net income method, which was not intended by the Legislature.

It may seem that $150,000 is a bit steep for the decreased value of a property with, as distinct from without, a place to park with access to public streets. But the city (again) has only itself to blame. The choose-$1,000-or-$150,000 strategy forced the jurors to select one number or the other, and the record indicates that $1,000 would be too low as a matter of law. Like many charming places, public parking in old town Orange can be hard to come by. As noted above, Hurwitz's property was the only one *on* the circle with its *own* parking, and public parking in the vicinity is limited to 2 hours.

Consider, as the jury no doubt could have considered, the dilemma of someone who wanted to buy the building to operate a law office just as Hurwitz has for over 55 years. Legal secretaries and lawyers often have to work late. A potential buyer of the building might very well be willing to pay a significant premium—certainly more than a paltry $1,000 in comparison to the purchase price—to guarantee close-in parking to a least a few of the firm's employees. The alternative would be to make them walk at least several blocks.

## IV. Disposition: The Judgment Is Affirmed

The judgment is affirmed. If our remarks in this opinion seem particularly tough on the city, one should remember that courts do not look charitably on litigants who directly violate court orders. For a *public entity* to violate a court order and then turn around and argue that its adversary should have tried to get another court order and that the failure to do so rendered the entity immune from judgment leaves us incredulous.

Hurwitz shall recover his costs on appeal.

Rylaarsdam, J., and Moore, J., concurred.