[Civ. No. 1822. Fifth Dist. June 13, 1974.]

THE PEOPLE EX REL. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v.
RYAN OUTDOOR ADVERTISING, INC., Defendant and Respondent.

## COUNSEL

Harry S. Fenton, Emerson Rhyner, John B. Matheny, Stephen A. Mason, Milton B. Kane and Ronald W. Beals for Plaintiff and Appellant.

Earl F. Hedlund for Defendant and Respondent.

## OPINION

**BROWN (G. A.), P. J.**—The Department of Public Works of the State of California (hereinafter the "Department") filed this action for declaratory relief and an injunction seeking to permanently enjoin Ryan Outdoor Advertising, Inc. (hereinafter "Ryan") from maintaining two advertising displays (hereinafter "billboards") located adjacent to Highway 99 in Stanislaus County and ordering their removal. The action was commenced pursuant to the provisions of the Outdoor Advertising Act (Bus. & Prof. Code,[1]

---

[1] Unless otherwise indicated all section references are to the Business and Professions Code by section numbers assigned upon reenactment of the Outdoor Advertising Act in 1970.

§ 5200 et seq.)[2] (hereinafter "Act"), the Department being the designated state agency responsible for administering and enforcing the Act (§§ 5250, 5254).

After making findings of fact and conclusions of law the trial court, sitting without a jury, found that the billboards were lawfully placed and maintained and were not in violation of the Act. The court thereupon denied the Department's prayer for an injunction and ordered the Department, upon Ryan's application and payment of fees, to issue permits for the billboards. The Department has appealed.

The facts will be stated in a light most favorable to the respondent, Ryan, resolving all conflicts and intendments in its favor. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

Since 1949 Ryan, pursuant to permits issued by the Department and under contracts with the owners of private property, maintained the two billboards in a nonbusiness district (§ 5205)[3] on the easterly side of Highway 99 at locations .92 miles and .03 miles south of the San Joaquin County line within 660 feet of the right-of-way and visible from it. The billboards did not advertise the sale or lease of the property upon which they were located nor did they advertise a business conducted upon the property.

In the mid 1960s the Department began purchasing a new right-of-way adjacent to the billboards for the purpose of widening Highway 99. Ryan was requested by the Department not to relocate the billboards until the entire width was acquired and the boundary line was finally established. In 1968, when the purchase of the right-of-way was completed, the Department directed Ryan to clear the right-of-way. In October of 1968, in response to that directive, Ryan moved the two structures laterally 25 to 40 feet on the same property, which was no more than the width of the billboards.

---

[2] The Outdoor Advertising Act was first enacted in 1933 (Stats. 1933, ch. 341, p. 938); in 1967, in response to the federal Highway Beautification Act of 1965 (23 U.S.C. § 131), the Legislature enacted substantial amendments to the Act (Stats. 1967, chs. 1252, 1408, pp. 3035, 3306) which became effective November 8, 1967. In 1970 the Act was repealed and reenacted as part of the Business and Professions Code (Stats. 1970, ch. 991, p. 1763), at which time the code sections were renumbered without significant substantive change.

[3] The issue of whether the billboards were in a business district was litigated and argued in the trial court. The court concluded: "The property upon which each of the outdoor advertising displays described in Finding 17 is located was not, at any time material hereto, a 'business area' as defined in Business and Professions Code section 5205." Neither party has questioned this finding on appeal.

The structures were not enlarged or otherwise reconstructed, and their impact upon the highway was not altered.

The Department did not condemn or purchase or seek to purchase Ryan's leasehold interest or the billboards.

In January of 1969, approximately two months after the completion of the relocation of the billboards, the Department issued permits to Ryan to maintain the billboards. These permits were issued in conformance with a long-standing custom and practice of the Department to not treat an involuntary relocation upon the same property as a new "placing" within the meaning of section 5225,[4] but rather as an incident to customary maintenance.

In March of 1969 the Department issued new guidelines for the enforcement of the Act which proscribed any movement of existing billboards, involuntary or otherwise, as a "placing" within the meaning of section 5225 of the Act.

Pursuant to the new guidelines, the Department cited Ryan in April of 1969 for "placing" the two billboards in a nonconforming location and ordered their removal. (See §§ 5350, 5461, 5462.) Ryan refused to remove the structures. This litigation followed. (See § 5465.)

Being within 660 feet of the edge of the right-of-way in violation of section 5405, subdivision (a), the billboards in their original location became nonconforming uses on November 8, 1967, the effective date of the 1967 amendments to the Act. Thereafter, they were subject to removal by certain dates (§§ 5409, 5410) upon the payment of just compensation (§§ 5411, 5412); removal could not be required until funds for compensation were made available (§ 5417).

If, however, the movement of the billboards constituted a placing under section 5225 (see fn. 4, *supra*), then pursuant to sections 5300 and 5350 the Act became operative, and since the placing was within 660 feet of the edge of the right-of-way in violation of section 5405, subdivision (a), the billboards were subject to removal as a nuisance (see §§ 5350, 5461).

---

[4]Section 5225 provides: "The verb, 'to place' and any of its variants, as applied to advertising displays, includes the maintaining and the erecting, constructing, posting, painting, printing, tacking, nailing, gluing, sticking, carving or otherwise fastening, affixing or making visible any advertising display on or to the ground or any tree, bush, rock, fence, post, wall, building, structure or thing. It does not include any of the foregoing activities when performed incident to the change of an advertising message or customary maintenance of the advertising display."

The trial court concluded: "1. Movement of a licensed advertising display for a short distance on the same parcel to comply with some affirmative action taken by public authority, where the impact of the display upon the adjacent highway is not substantially altered, is incident to customary maintenance and does not constitute a 'placing' or a new licensing event within the meaning of the Outdoor Advertising Act.

"2. The minimal movement of the two structures here in question was under the circumstances presented an incident of customary maintenance and not a 'placing' within the meaning of Business and Professions Code Section 5225."

Our task, therefore, is to judicially interpret the provisions of section 5225.

The proper interpretation of statutory language is a question of law for the court and we are not constricted in this regard by the conclusions of the trial court. (Evid. Code, § 310; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 17 [9 Cal.Rptr. 607, 357 P.2d 839] (cert. den., 365 U.S. 823 [5 L.Ed.2d 700, 81 S.Ct. 708]).) In construing the statutory language the primal principle of statutory construction requires the ascertainment of the intent of the legislative body. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) When, as here, there is no direct evidence of the legislative intent, the court turns first to the words of the enactment for the answer and may also rely upon extrinsic aids (*People* v. *Knowles* (1950) 35 Cal. 2d 175, 182-183 [217 P.2d 1] (cert. den., 340 U.S. 879 [95 L.Ed. 639, 71 S.Ct. 117]); *In re Miller* (1947) 31 Cal.2d 191, 198-199 [187 P.2d 722]), including recitals and findings in the enactment (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 256 [104 Cal.Rptr. 761, 502 P.2d 1049]). "Excepting when clearly otherwise intended or indicated, words in a statute should be given their ordinary meaning and receive a sensible construction in accord with the commonly understood meaning thereof. [Citation.] Section 13 of the Civil Code provides: 'Words and phrases are construed according to the context and the approved usage of the language; . . .'" (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 642 [122 P.2d 526].)

Ryan strongly relies upon the fact that the operative language of section 5225 has remained substantially the same since 1933[5] and

---

[5]The only change in the definition contained in section 5225 was the addition of the last sentence in the 1967 amendments. It reads: "It does not include any of the

that the administrative interpretation of that section by the Department permitted relocation of billboards upon the same property without a new application or permit until the Department promulgated its new guidelines in March 1969.

It is, of course, true that the contemporaneous and practical construction of a statute by those whose duty it is to carry it into effect, while not conclusive, is given great respect and will be followed if not clearly erroneous. (*Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935]; *Christensen* v. *Thurber* (1953) 120 Cal. App.2d 517, 519 [261 P.2d 312].)

However, since the ultimate interpretation of the statute is an exercise in judicial power, "it is the duty of [the] court, when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively, even though this requires the overthrow of an earlier erroneous administrative construction." (*Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.2d at p. 326.)

On its face, the lexicographers' definition of maintenance, which is the "ordinary meaning" or "commonly understood meaning" (see *County of Los Angeles* v. *Frisbie, supra,* 19 Cal.2d at p. 642) of the term, is inapposite to the concept of dislodging and relocating a billboard at another location even though it be only a short distance. Maintenance is defined in Webster's New World Dictionary of the American Language (2d College ed.) as "a maintaining or being maintained; upkeep, support, defense, etc.; [specifically], the work of keeping a building, machinery, etc. in a state of good repair. . . ." The word "maintain" is defined as "to keep or keep up; continue in or with; carry on . . . [and] to keep in a certain condition or position, [especially] of efficiency, good repair, etc.; preserve (to maintain roads). . . ."

Another principle which must be applied in analyzing the legislative usage of the words "to place" and "customary maintenance" is that " 'the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, . . .' " (*People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543 [72 Cal.Rptr. 790, 446 P.2d 790].)

---

foregoing activities when performed incident to the change of an advertising message or customary maintenance of the advertising display."

■ The record is clear that prior to the 1967 Act the Department in issuing permits for billboards had little concern with any consideration other than safety, structural stability and public decency. (See 55 Ops. Cal.Atty.Gen. 1, 6.) With the passage of the 1967 Act, however, in response to the federal Highway Beautification Act of 1965 (23 U.S.C. § 131),[6] the extent of the regulation was vastly expanded, the coverage of the act was extended to every mile of every major road in California and it added emphasis upon esthetic considerations resulting from preserving the scenic beauty of lands bordering on highways. (§ 5226; see 23 U.S.C. § 131, subd. (a).) This legislative action is but one manifestation of the pervasive public preoccupation with the preservation of the landscape and environment.

■ We are not unaware of the legislative findings recognizing the legitimacy of using property adjacent to highways for outdoor advertising.[7] It is obvious, however, that the legislative concern does not extend to sanctioning the continued existence of such structures in prohibited areas but only to their maintenance until such time as just compensation is paid for their removal. (§§ 5409-5412, 5417.) Thus these recitals would not support an interpretation of intent that nonconforming structures remain in prohibited areas but, on the contrary, point toward an opposite conclusion.

■ From these considerations we believe that the plain language of the statute, as well as the general tenor and scope of the entire scheme embodied in the enactments, including the objective sought to be achieved, leads to the sure conclusion that the movement of the billboards, even for a short distance, was a "placing" rather than merely "customary maintenance." (See *New York State Thru. Auth.* v. *Ashley Motor Court* (1961) 12 App.Div.2d 223 [210 N.Y.S.2d 193]; *People* v. *Benincasa* (1970) 63 Misc.2d 648 [313 N.Y.S.2d 211].)

■ We fail to perceive how the movement and relocation of the billboards pursuant to affirmative action taken by the public authority could,

---

[6]23 United States Code section 131 provides in part: "(a) The Congress hereby finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty."

[7]Section 5226 provides in part: ". . . The Legislature finds: (a) Outdoor advertising is a legitimate commercial use of property adjacent to roads and highways. (b) Outdoor advertising is an integral part of the business and marketing function, and an established segment of the national economy, and should be allowed to exist in business areas, subject to reasonable controls in the public interest."

absent a statutory exception, alter the meaning of "placing" vis-à-vis "customary maintenance" as we have defined the scope of those words herein; though such circumstances could and have given rise to the argument asserted by Ryan that the Department, on equitable principles, should not be permitted to require removal of the relocated billboards. We have concluded, however, for the reasons about to be mentioned, that the Department cannot be estopped from requiring the removal of the billboards. (*Pettitt* v. *City of Fresno* (1973) 34 Cal.App.3d 813 [110 Cal.Rptr. 262].)

In view of the meaning of "placing" as compared to "customary maintenance" as we have defined those terms and the statutory prohibition against "placing," the Department did not have the authority to issue the permit in January 1969 or to orally represent that it would be permissible to move the billboards outside the right-of-way. As the court said in *Merco Constr. Engineers, Inc.* v. *Los Angeles Unified Sch. Dist.* (1969) 274 Cal.App.2d 154, 160 [79 Cal.Rptr. 23]: "Estoppel may be invoked against a governmental agency only when the agency has the power to do that which it promised to do or which it led the opposing party reasonably and justifiably to believe it would do. Where, however, the procedure specified in a statute is the measure of the agency's power to act, estoppel cannot be applied to enlarge that power. [Citation.]"

In *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal. Rptr. 23, 476 P.2d 423], the court instructed: "It is settled that '[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it. [Citation.]' [Citations.] Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public, . . .' [Citation.] The tension between these twin principles makes up the doctrinal context in which concrete cases are decided." And it is well settled that " '. . . [N]either the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public. . . .' [Citation.]" (*Merco Constr. Engineers, Inc.* v. *Los Angeles Unified Sch. Dist., supra,* 274 Cal.App.2d at p. 162.)

In *Pettitt* v. *City of Fresno, supra,* 34 Cal.App.3d 813, this court held that a city was not estopped from denying owners of a building located in an area zoned single family residential the right to use the entire building as a beauty salon. Even though the city had issued a permit authorizing alterations to the building for that purpose and the owners had ex-

pended substantial sums in making the alterations, the building permit was invalid and not authorized by statute in that it purported to authorize the expansion of a nonconforming use and conversion of a residential use to a commercial one. We observed that estoppel would not be invoked against a governmental agency where it would defeat the effective operation of a policy adopted to protect the public, and held the field of zoning law involves a vital public interest and not one that is strictly between the municipality and the individual litigant. Permitting the violation of the zoning law to continue would give no consideration to the interest of the public in the area nor to the strong public policy in favor of eliminating nonconforming uses and against expansion of such uses. (See *Magruder* v. *City of Redwood* (1928) 203 Cal. 665 [265 P. 806]; *Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 90-91 [124 P.2d 34, 140 A.L.R. 570]; and other cases cited in *Pettitt* v. *City of Fresno, supra.*)

The state law prohibiting the placement of advertising displays in prohibited areas has a striking resemblance to the objects and purposes intended to be accomplished by zoning. Cities and counties retain the authority to regulate signs and billboards by zoning (Gov. Code, § 65850, subd. (b); § 5230), and a city may pass such regulations by general ordinance (Gov. Code, § 38774, subd. (a); *City of Escondido* v. *Desert Outdoor Advertising, Inc.* (1973) 8 Cal.3d 785 [106 Cal.Rptr. 172, 505 P.2d 1012]). The identical policy against the expansion or change of such nonconforming uses should apply with equal force in the case of nonconforming billboards as is applicable in zoning practice. (*County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683, 686-687 [234 P.2d 972].) Accordingly and by a parity of reasoning, we have concluded that to apply estoppel would effectively nullify a strong public policy adopted for the benefit of the public and we view the illegal placing of billboards in violation of the Outdoor Advertising Act in the same category as that involved in permission to expand a nonconforming use. Equitable principles therefore will not protect Ryan from being required to remove the billboards in the case at bench.

We deem it appropriate, however, to add a caveat, inasmuch as it is at once apparent that no strong public policy would be violated in requiring compensation to be paid to Ryan upon removal of the billboards. In fact, it is the policy of both the federal government and the State of California to reject the use of the police power in acquiring these advertising rights and to require the payment of just compensation for them. (55 Ops.Cal. Atty.Gen. 1; 23 U.S.C. § 131, subds. (g), (n); §§ 5412, 5413, 5414, 5417.)

Had Ryan not removed its billboards to clear the right of way, it would have been entitled to just compensation for their taking in the condemnation action; had the Department not widened the highway and had the billboards remained where they were originally placed as nonconforming uses, the Department, under the above sections, would have been required to pay just compensation for them before they were removed; under the findings of the court the Department ordered Ryan to clear the right-of-way, and in reliance thereon, Ryan removed the billboards and placed them outside the right-of-way line. Although the Department takes the position that the movement of the billboards was a new placement which would permit their removal without compensation, the fact that the movement of the billboards was an involuntary displacement resulting from the Department's road-widening activities may be sufficient to justify the application of the doctrine of equitable estoppel. There being no public policy against requiring the Department to pay compensation, the doctrine of estoppel could be legally applied to prevent the Department from denying a claim for damages by Ryan, should Ryan choose to proceed in a separate inverse condemnation suit after removal is effected. As was said in *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, at pages 496-497: "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (See also *City of Fontana* v. *Atkinson* (1963) 212 Cal.App.2d 499 [28 Cal.Rptr. 25].)

The existence of an estoppel is a question of fact for the trial judge whose determination is normally conclusive on appeal. (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

The judgment is reversed. Each party to bear its own costs on appeal.

Gargano, J., and Franson, J., concurred.

A petition for a rehearing was denied June 28, 1974, and respondent's petition for a hearing by the Supreme Court was denied August 21, 1974.