[No. A110628. First Dist., Div. Two. June 8, 2006.]

VIACOM OUTDOOR, INC., Plaintiff and Respondent, v.
CITY OF ARCATA et al., Defendants and Appellants.

## COUNSEL

Law Offices of Nancy Diamond, Nancy Diamond; Mitchell, Brisso, Delaney & Vrieze, William F. Mitchell and Nancy K. Delaney for Defendants and Appellants.

Greines, Martin, Stein & Richland and Timothy T. Coates for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Barnum & Herman and William F. Barnum for Plaintiff and Respondent.

## OPINION

**BUSCH, J.**\*—The trial court determined that state law preempted the efforts by the City of Arcata (City) to enforce its ordinances requiring permits before Viacom Outdoor, Inc. (Viacom), could rebuild a number of wind-destroyed billboards. Because it had no authority to insist on compliance with its ordinances, the City was also found to have violated Viacom's federal civil rights. Damages and attorney fees were awarded to Viacom under federal civil rights statutes.

The primary issue presented on this appeal by the City is whether California's Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.; the State Act)[1] preempts municipal ordinances that require a permit for rebuilding outdoor stand-alone billboards destroyed by natural forces. We conclude this well-established local power is not displaced by the State Act. We further conclude that because the municipal ordinances are valid and enforceable, their threatened enforcement has not yet been shown to have caused actionable damage. In light of these conclusions, we reverse.

### BACKGROUND

The salient facts are easily recounted. Viacom owned four billboards located within the City and adjacent to State Highway 101. For each of the billboards Viacom had a current outdoor advertising permit issued by the California Department of Transportation (CalTrans). The billboards were made of wood. Three were put up in 1954, the fourth in 1962. The billboards were destroyed by windstorms in November and December of 2001. Viacom began rebuilding the billboards. A city official posted "stop work" orders on the billboards, thus directing Viacom to cease rebuilding until it applied for permits as required by the City's Building Code and its Sign Code.[2] Although Viacom stopped rebuilding, in subsequent correspondence with the City it insisted it was not obliged to obtain permits prior to rebuilding its billboards.

Viacom did not apply for permits, but it did commence this action against the City and the members of the city council. Viacom alleged three causes of action in its complaint. The first was a petition for a writ of mandate on the ground that the State Act (and regulations promulgated pursuant thereto)

---

\*Judge of the Superior Court of San Francisco County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Statutory references are to this code unless otherwise indicated.

[2] As required by state law, the City adopted the Uniform Building Code formulated by the International Conference of Building Officials. (See Health & Saf. Code, §§ 17921, 17922, subd. (a)(2), 17958, 17958.5.) Although the Sign Code adopted by the city comes from the same source, its adoption was not required by state law. (See Health & Saf. Code, § 17922, subd. (a) [directing adoption of housing, building, plumbing, electrical, and mechanical codes promulgated by specified organizations].)

constituted the sole applicable law, meaning the City had no "regulatory authority" to require permits for reconstructing billboards. Specifically, the State Act withdrew municipal power over "customary maintenance" of any billboard for which CalTrans had issued a permit (citing § 5225 & Cal. Code Regs., tit. 4, § 2271). The second cause of action sought declaratory relief to the effect that "The legislature enacted the Outdoor Advertising Act with the express intention to preempt the entire field of regulation of billboards in California, allowing cities only the power to regulate the locations and placements of new billboard structures. All other acts of municipalities are defined as ultra vires acts for which compensation must be paid to CalTrans billboard permit holders. The City of Arcata has no power . . . to require the application for, or issuance of, city building permits . . . ."

Viacom's third and final cause of action invoked the federal Civil Rights Act of 1871 (42 U.S.C. § 1983). Viacom alleged the City's actions "unfairly singles out [Viacom] to bear the burden of government action in violation of the Equal Protection Clause as set forth in Article I, Section 7(a) of the California Constitution and the Fourteenth Amendment of the United States Constitution," and also infringed Viacom's "procedural and substantive due process rights and denie[d] just compensation for governmental taking of private property, all in violation of Article I, Section 7(a) of the California Constitution and the Fifth and Fourteenth Amendments of the United States Constitution." Viacom prayed for monetary damages and an injunction preventing the City from attempting to enforce "any municipal . . . permit conditions or requirements."

The case was tried in two stages. In the first, the court granted Viacom's petition for a writ of mandate upon concluding that "California Code of Regulations, section 2271, preempts the field. It sets forth the criteria by which billboards may be re-erected. If those criteria are met, no further action by a local public entity is necessary. The California Department of Transportation is the sole governing agency under such circumstances. [¶] The City of Arcata is enjoined from interfering with the re-erection of the billboards."

There followed a bench trial on the issue of damages. The court concluded that the City's "unlawful interference with [Viacom's] right under the Outdoor Advertising Act to reconstruct billboards blown down in a storm" constituted a violation of Viacom's "civil right to enter into and maintain contracts. Here, because [Viacom] could not reconstruct the billboards without the threat of action by the City of Arcata, [Viacom] could not perform its contracts with its vendees by supplying the advertising required by those contracts. The City of Arcata, then, intentionally interfered with [Viacom's] contractual relations, a property right guaranteed by the state and federal constitutions." The court fixed Viacom's "damages for lost rent in the sum of

$37,483.94." The court further found that Viacom was entitled to attorney fees under title 42 United States Code section 1988. The court thereafter entered judgment awarding Viacom damages of almost $39,000, attorney fees of $39,104, and an injunction prohibiting the City "from interfering with [Viacom's] re-erection of the wind blown billboards." The City then perfected this timely appeal.

## DISCUSSION

Since 1999 the City's sign code has provided that "A sign shall not hereafter be erected, re-erected, constructed, altered or maintained except as provided by this code and after a permit has been issued . . ." and making it "unlawful for a person, firm or corporation to erect, construct, enlarge, alter, repair, move, improve, remove, convert or demolish, equip, use, or maintain a sign or sign structure in this jurisdiction . . . contrary to or in violation of the provisions of this code." (Arcata Sign Code, §§ 301, 103.4.) It was the attempted exercise of this ordinance that the trial court found was preempted by the State Act.

■ "The general principles governing preemption analysis are these. [¶] Under article XI, section 7 of the California Constitution, '[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.'

■ " 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' [Citations.] [¶] 'A conflict exists if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' [Citations.]

"Local legislation is 'duplicative' of general law when it is coextensive therewith. [Citation.] [¶] Similarly, local legislation is 'contradictory' to general law when it is inimical thereto. [Citation.]

■ "Finally, local legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that is has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality.

[Citations.]" (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897–898 [16 Cal.Rptr.2d 215, 844 P.2d 534], fn. omitted (*Sherwin-Williams*); accord, *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 860–861 [118 Cal.Rptr.2d 746, 44 P.3d 120]; *People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476, 484–485 [204 Cal.Rptr. 897, 683 P.2d 1150].)

■ Billboards have long been recognized as a proper subject for local regulation under the police power. (*St. Louis Poster Adv. Co. v. St. Louis* (1919) 249 U.S. 269, 274–275 [63 L.Ed. 599, 39 S.Ct. 274]; *Cusack Co. v. City of Chicago* (1917) 242 U.S. 526, 529 [61 L.Ed. 472, 37 S.Ct. 190]; *United Advertising Corp. v. Borough of Raritan* (1952) 11 N.J. 144 [93 A.2d 362, 365–366] and authorities cited; 7 McQuillen, The Law of Municipal Corporations (3d ed. 2005 rev. vol.) § 24:379 et seq.; Annot., Power of Municipality as to Billboards and Outdoor Advertising (1931) 72 A.L.R. 465.) California counties and municipalities have not been hesitant to exercise their regulatory powers on this subject. (E.g., *Tahoe Regional Planning Agency v. King* (1991) 233 Cal.App.3d 1365, 1395 [285 Cal.Rptr. 335]; *Mountain View Chamber of Commerce v. City of Mountain View* (1978) 77 Cal.App.3d 82, 93 [143 Cal.Rptr. 441]; *Burk v. Municipal Court* (1964) 229 Cal.App.2d 696, 701 [40 Cal.Rptr. 425]; *National Advertising Co. v. County of Monterey* (1962) 211 Cal.App.2d 375, 377–380 [27 Cal.Rptr. 136]; *People v. Norton* (1930) 108 Cal.App. Supp. 767, 773 [288 P. 33].) The regulatory powers of cities and counties do not rest solely on our state Constitution; the Legislature has codified local authority to regulate billboards (Gov. Code, §§ 38774, subd. (a), 65850, subd. (b)).

Local power has never been viewed as a zero-sum contest with the state's authority to regulate outdoor advertising. In fact, the history of the State Act demonstrates that the totality of regulatory power has been shared for a considerable period. When first enacted in 1933, the uncodified provisions of the State Act applied to outdoor advertising structures by means of a permit system administered by the Director of the Department of Public Works. (Stats. 1933, ch. 341, p. 938.) The scope of the measure was subject to an important limitation: "The provisions of this act shall apply only to the placing or maintenance of advertising structures and/or signs located in any of the territory of the State of California, *other than the territory within incorporated cities and towns and incorporated cities and counties*." (*Id.*, § 2, p. 939, italics added.)

The Legislature reiterated this point when the State Act was codified in 1939, directing that its "provisions . . . apply only to the placing of advertising displays within view of the public highways located in any of the territory of the State of California, other than the territory within incorporated

cities and towns." (Stats. 1939, ch. 32, § 1, p. 334, adding former § 5226.) The regulatory domain claimed for the state's exclusive jurisdiction was modest: "The regulation of the placing of advertising displays by *this chapter in so far as such regulation may affect the placing of advertising displays within view of the public highways of this State in unincorporated areas, shall be exclusive of all other regulations for the placing of advertising displays within view of the public highways of this State in unincorporated areas whether fixed by a law of this State or by a political subdivision thereof.*" (*Ibid.*, adding former § 5225, italics added.)[3] At the same time, former section 5227 was enacted to read: "It is the intention of the Legislature to occupy the whole field of regulation by the provisions of this chapter except that nothing in this chapter prohibits enforcement of any or all of its provisions by persons designated so to act by appropriate ordinances duly adopted by any county of this State nor does anything prohibit the passage by any county of reasonable land use or zoning regulations affecting the placing of advertising displays . . . ." (Stats. 1939, ch. 32, § 1, p. 333.) The obvious point is that the Legislature intentionally extended the exclusive reach of the State Act only to counties, and only to the unincorporated parts of counties adjacent to what were then state highways. These provisions, read together, did not purport to extend any exclusive state power to state highways located within cities.

Section 5227 is one of a number of provisions in the current version of the State Act aimed at demarcating the boundaries of responsibility between the state, counties, and cities. Section 5229 specifies that the State Act "shall not be construed to permit a person to place or maintain in existence on or adjacent to any street, road or highway . . . any outdoor advertising prohibited by law or by any ordinance of any city, county or city and county." Section 5228 declares the Legislature's intent to "establish minimum standards" with respect to "advertising displays adjacent to highways," and section 5230 states: "The governing body of any city, county, or city and county may enact ordinances, including, but not limited to, land use or zoning ordinances, imposing restrictions on advertising displays adjacent to any street, road, or highway equal to or greater than those imposed by this chapter, if Section 5412 is complied with.[4] No city, county, or city and county may allow an

---

[3] This provision is now section 5270. The same attitude is reflected in section 5271: "Except as otherwise provided in this chapter, the provisions of this chapter apply only to the placing of advertising displays within view of highways located in unincorporated areas of this state, except that the placing of advertising displays within 660 feet from the edge of the right-of-way of, and the copy of which is visible from, interstate highways or primary highways, including the portions of such highways located in incorporated areas, shall be governed by this chapter."

[4] Section 5412 provides: "Notwithstanding any other provision of this chapter, no advertising display which was lawfully erected anywhere within this state shall be compelled to be removed, nor shall its customary maintenance or use be limited, whether or not the removal or

advertising display to be placed or maintained in violation of this chapter." Section 5231 provides: "The governing body of any city or city and county may enact ordinances requiring licenses or permits, or both, in addition to those imposed by this chapter, for the placing of advertising displays in view of any highway . . . within its boundaries." Moreover, section 5408.3 provides that "a city or a county with land use jurisdiction . . . may adopt an ordinance that establishes standards for the spacing and sizes of advertising displays that are more restrictive than those imposed by the state."[5] They may also enter agreements with the owners for the relocation of advertising displays. (§ 5443.) Finally, in terms of whether a display has been "lawfully erected," meaning that it cannot be removed without payment of just compensation (§ 5412), the State Act defines "lawfully erected" displays as those "erected in compliance with state laws *and local ordinances* in effect at the time of their erection or which were subsequently brought into full compliance with state laws *and local ordinances*" (§ 5216.1, italics added).

The State Act operates by regulating the business of outdoor advertising, defined as placing an advertising display or changing the message of an advertising display for another person's business. (§ 5300, subd. (a).) Persons or firms engaging in the business of outdoor advertising must have a license issued on an annual basis by CalTrans. (§§ 5301–5303.) A licensee must have a permit—also issued by CalTrans—for each advertising display. (§§ 5350–5351, 5353–5355.) The permit is good for five years, and can be renewed for additional five-year terms. (§§ 5358, 5360.) A licensee seeking a permit to place an advertising display in a new location must "offer written evidence that . . . the city or the county with land use jurisdiction over the property upon which the location is situated ha[s] consented to the placing . . . ." (§ 5354, subd. (a).) In addition, the Legislature expressly noted: "The issuance of a permit pursuant to this chapter does not allow any person to erect an advertising display in violation of any ordinance of any city, county, or city and county" (§ 5366), and this includes county zoning laws. (§ 5359, subd. (b).)[6] Finally, nothing in the State Act prevents cities or counties from exercising the ultimate regulation—the immediate removal of

---

limitation is pursuant to or because of this chapter or any other law, ordinance, or regulation of any governmental entity, without payment of compensation, as defined in the Eminent Domain Law . . . ."

[5] The State Act is also peppered with statutes exempting specified conditions or areas. (E.g., §§ 5273.5 [signs advertising business in certain redevelopment areas], 5405.6 [displays on land owned by Los Angeles County Metropolitan Transportation Agency], 5408.2 [displays adjacent to State Highway 10 in unincorporated areas of Los Angeles County], 5408.7 [displays on San Francisco streets designated as state or federal highways], 5442.10 [permitting limited number of displays approved by Oakland-Alameda County Coliseum Authority], 5442.11 [displays in Los Angeles Mid-City Recovery Redevelopment Project Area].)

[6] There are additional, more particularized powers granted to localities. A city or county may adopt standards for advertising displays in business districts "that are more restrictive than those imposed by the state." (§ 5408.3.) Although not covered by the State Act provisions

existing billboards—if they are willing to pay compensation to the billboard's owner. (§§ 5230, 5412–5414.)

■ Viewed against this backdrop, it is obvious that a general theory of state preemption is untenable. Section 5227 cannot be read in isolation. Such an approach is contrary to the rule of construction requiring consideration of all parts of a statutory scheme to allow harmonious operation and effectiveness for every provision. (E.g., *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744 [110 Cal.Rptr.2d 828, 28 P.3d 876]; *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040 [130 Cal.Rptr.2d 672, 63 P.3d 228]; *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) Allowing the opening words of section 5227 to obliterate county and city regulatory powers could be accomplished only by ignoring the language of sections 5228, 5230, 5231, 5366 et al., thus turning them into dead letters. This too is not an option open to us. (E.g., *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 379 [7 Cal.Rptr.3d 803, 81 P.3d 244]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Moreover, it is not the interpretation given to section 5227 by the courts and the Attorney General. (*Desert Outdoor Advertising, Inc. v. County of San Bernardino* (1967) 255 Cal.App.2d 765, 772 [63 Cal.Rptr. 543]; *County of Santa Barbara v. Purcell, Inc.* (1967) 251 Cal.App.2d 169, 174–175 [59 Cal.Rptr. 345]; 21 Ops.Cal.Atty.Gen. 43 (1953).)

■ Neither section 5227, nor any other provision of the State Act, uses the type of language accepted as expressly preempting all local power over a given topic.[7] There is no scope for finding implied preemption because the

governing outdoor advertising displays, a city or county also has authority to adopt an ordinance more strictly regulating, or compelling the removal of, on-premises advertising displays. (§§ 5491.1, 5495, 5495.5, 5496, 5497, 5499.2.)

[7] Such as: Government Code sections 53071 ("It is the intention of the Legislature to occupy the whole field of regulation of the registration or licensing of commercially manufactured firearms as encompassed by the provisions of the Penal Code, and such provisions shall be exclusive of all local regulations . . . by any political subdivision . . ."), 12993 ("it is the intention of the Legislature to occupy the field of regulation of discrimination in employment and housing . . . exclusive of all other laws . . . by any city, city and county, county, or other political subdivision . . ."); Health and Safety Code sections 113705 ("The Legislature finds and declares that the public health interest requires that there be uniform statewide health and sanitation standards for retail food facilities . . . . It is the intention of the Legislature to occupy the whole field of health and sanitation standards for these food facilities, and the standards set forth in this chapter and regulations adopted pursuant to its provisions shall be exclusive of all local health and sanitation standards relating to these facilities"), 116409 ("It is the intent of the Legislature in enacting this article to preempt local government regulations, ordinances, and initiatives that prohibit or restrict the fluoridation of drinking water . . ."); Insurance Code section 1633.5 ("It is hereby declared to be the intent of the Legislature in enacting this chapter that the regulations prescribed herein be the exclusive regulations relating to the conduct of insurance business by persons licensed to act in any of the capacities defined hereunder, any local regulations notwithstanding"). For additional examples, see *Morehart v. County of Santa*

State Act makes considerable allowance for past and future county and city ordinances on the subject of advertising displays. As shown by the plain language of sections 5228, 5230, 5231, and 5408.3, the Legislature clearly contemplated that local regulation would augment the State Act, and might in some instances go beyond it. "An expressed intent to allow local regulation, or an express recognition of local regulation, is convincing evidence that the state legislative scheme was not intended to occupy the field." (*IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 94, fn. 10 [2 Cal.Rptr.2d 513, 820 P.2d 1023].) It is therefore not possible to conclude that the subject of billboards "has been so fully and completely covered by [state] law . . . that it has become exclusively a matter of state concern" or "has been partially covered by [state] law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action." (*Sherwin-Williams, supra*, 4 Cal.4th 893, 898, quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809].)

Section 2271 of title 4 of the California Code of Regulations (Regulation 2271), cited by the trial court, falls short of demonstrating the state's intention to exclude local regulatory action. It has a far more modest scope. But the operation of Regulation 2271 cannot be appreciated without appreciating the concept of "customary maintenance," a term defined in the immediately preceding regulation (Cal. Code Regs., tit. 4, § 2270 (Regulation 2270)). As will be shown, these regulations effect no diminution of the City's traditional power to require permits.

"Customary maintenance" is a term used in two provisions of the State Act (§§ 5225, 5412), but most fully explained in Regulation 2270 as "any activity performed" on an advertising display "for the purpose of actively maintaining the Display in its existing approved physical configuration and size dimensions at the specific location" approved on the permit issued by CalTrans. "Customary maintenance includes the following activities: [¶] (1) Changing of the advertising message. [¶] (2) Adding an Extension to an outside dimension of a Display as incident to the copy for a temporary period up to three years. [¶] (3) The sale, lease, or transfer of the Display or its Permit. [¶] (4) Adding a Light Box." (Reg. 2270, subd. (a).) Customary maintenance does not encompass "(1) Raising the height of the Display from ground level. [¶] (2) Relocating all or portion of a Display. [¶] (3) Adding a back-up Facing . . . . [which is defined in Cal. Code Regs., tit. 4, § 2242, subd. (*l*) as "the portion of the Display that contains advertising copy"]. [¶] (4) Increasing any dimension of a Facing except as permitted by Section 2270(a)(2). [¶] (5) Turning the direction of a Facing. [¶] (6) Adding illumination or a

Barbara (1994) 7 Cal.4th 725, 748–750 [29 Cal.Rptr.2d 804, 872 P.2d 143]; *Waste Resource Technologies v. Department of Public Health* (1994) 23 Cal.App.4th 299, 304 and footnote 6, 306, footnote 7 [28 Cal.Rptr.2d 422].

Changeable message . . . with the exception of a light box." (Reg. 2270, subd. (b).) The import of Regulation 2270 is routine upkeep or modest improvements, not an extraordinary event like rebuilding a billboard after it has been destroyed.

■ Regulation 2271 only deals with the procedures to maintain a CalTrans permit, thereby allowing continued "customary maintenance," after an advertising display becomes "nonconforming" because it has been "destroyed." It provides:

"(a) A Display is destroyed and not eligible for customary maintenance when for 60 days after notice from the Department [i.e., CalTrans], it remains damaged and is not used for the purpose of outdoor advertising in the configuration (size, Facings, location, structure) approved by the Department.

"(b) When the Department becomes aware of or identifies a damaged Display, the Department mails a written notice by certified mail to the Permittee beginning the 60-day period for the Permittee to refurbish, replace, rebuild, or re-erect in kind or smaller the damaged Display . . . . Refurbishing, replacing, rebuilding or re-erecting shall be to the approved characteristics as recorded in the department's records for the Display. This notice is not necessary if the Permittee has completed repair back to the approved characteristics prior to notice being issued by the Department.

"(c) The Permittee has until the end of the 60-day time period identified in the Department's notice to repair, replace, or rebuild, or re-erect in kind the damaged nonconforming Display and place advertising copy. Upon receiving written notice from the Permittee showing good cause prior to the 60th or last day of the time period, the Department may extend the established time period not to exceed a total of six months. In such case, the Department shall issue a written response identifying by what date the work must be completed.

"(d) When the Display is not restored and advertising is not placed before the last day of established time period, the Display's customary maintenance is ended and the Display is deemed destroyed. When the Display is deemed destroyed, the permit is revoked, subject to appeal and the remains of the Display are subject to removal . . . . After the permit is revoked, a permit may not be issued for the location unless the Display conforms to all laws and regulations in effect at the time of application . . . ."

■ Properly understood, Regulation 2271 addresses only certain circumstances that will not result in loss of a CalTrans permit. During the 60-day period, the billboard owner can repair the damaged display, that is, perform customary maintenance. If the damage is sufficiently extensive, the owner can "re-erect" the billboard.

■ Viacom argues that CalTrans regulations, specifically Regulation 2271, "subject the outdoor advertising industry to municipal regulation of building standards only at the time of placement of billboards." Once the billboard is up, the sole regulatory role belongs to the state, in the form of CalTrans; localities are involved only for the "initial . . . placement of a new outdoor advertising display." Once the billboard is up, the owner is permitted to undertake "customary maintenance," including rebuilding, without interference from local authorities. Viacom cannot point to any statutory language, or any regulation, which hints at such a limitation on local regulatory authority. Instead, the plain language of the State Act is to the contrary. "Placement" is defined by the State Act as not only erecting, but also "maintaining" signs. (§ 5225.)[8] "Maintaining" necessarily takes place *after* the initial construction of the billboard, and such activity is excluded from the definition of "placement" only if it constitutes "customary maintenance." As we have concluded, re-erection goes beyond customary maintenance. Therefore, re-erection amounts to a placement of the billboard. (*Ibid.*; see *People ex rel. Dept. Pub. Wks. v. Ryan Outdoor Advertising, Inc.* (1974) 39 Cal.App.3d 804, 810–814 [114 Cal.Rptr. 499].). Placement of an advertising display is an area where local power is expressly recognized by the State Act. (E.g., §§ 5229, 5231.)

Moreover, the language of Regulation 2271 speaks exclusively to the power of CalTrans. It does not address whether any other jurisdiction's permit might be needed before a billboard is re-erected. Nothing in it suggests a restriction of the traditional power of cities and counties to require construction permits. Nothing in Regulation 2271 suggests that local power, once exercised, would thereafter be exhausted. Nothing in it suggests why the Legislature would allow cities and counties to require a building permit for the initial construction of a billboard, but would deny them that power if the billboard is destroyed and the owner wants to re-erect. Arguably, the fact that Viacom's billboard structures failed is exactly the kind of event that the Legislature could have concluded justified affording local government the opportunity to address the issue through the permit process. And no regulation could outmuscle the plain language of the numerous provisions in the State Act recognizing that aspect of local power. (E.g., Gov. Code, § 11342.2; *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 321 [87 Cal.Rptr.2d 423, 981 P.2d 52]; *California Teachers Assn. v. Commission on Teacher*

---

[8] Section 5225 provides: "The verb, 'to place' and any of its variants, as applied to advertising displays, includes the maintaining and the erecting, constructing, posting, painting, printing, tacking, nailing, gluing, sticking, carving or otherwise fastening, affixing or making visible any advertising display on or to the ground or any tree, bush, rock, fence, post, wall, building, structure or thing. It does not include any of the foregoing activities when performed incident to the change of an advertising message or customary maintenance of the advertising display."

*Credentialing* (1992) 7 Cal.App.4th 1469, 1475 [10 Cal.Rptr.2d 126] ["administrative regulations may not contravene the terms . . . of the statutes under which they have been adopted"].)

■ Viacom does not explain how its construction of Regulation 2271 is consistent with the language of the numerous provisions of the State Act allowing local regulation. Sections 5229 and 5231 are particularly pertinent in this respect. Section 5229 withholds permission for "a person to place *or maintain* . . . any outdoor advertising prohibited by . . . any ordinance of any city, county, or city and county." (Italics added.) And section 5231 expressly allows local governments to require a permit for placement of a sign, which we have concluded encompasses re-erecting the sign. Here is express statutory authority for the role Viacom claims the City cannot exercise. This is not all. The State Act is equally explicit in not restricting to the state the power to act against billboards which, although already in existence, were not lawfully erected. (§ 5461 ["All advertising displays which are placed or which exist in violation of . . . this chapter are public nuisances and may be removed by *any public employee* . . ." (italics added)].)

Viacom claims our Supreme Court's decision in *Traverso v. People ex rel. Dept. of Transportation* (1993) 6 Cal.4th 1152 [26 Cal.Rptr.2d 217, 864 P.2d 488] (*Traverso*), supports its position. The issue in *Traverso* was the facial constitutionality of section 5463, which authorizes CalTrans to revoke a permit and remove a billboard that is not in compliance with the State Act. In the course of recounting the "Facts," the court stated: "Adco [Traverso's company] renewed its permit each year up to and including December 31, 1984, as required by section 5360. In early 1984, the billboard fell down due to circumstances that are apparently still undetermined. If the billboard was destroyed, 'as the result of criminal or tortious acts,' as Caltrans assumes, then repair of the structure must be completed within 30 days after receipt of written notice from Caltrans. [Citation.] If, on the other hand, the billboard blew down in a windstorm as Adco maintains, there appears to be no express time limit for completion of repairs." (*Traverso*, at p. 1158.) From this passage Viacom discerns that "the Supreme Court has determined that billboards blown down by windstorms may be repaired under CalTrans' Regulations," and presumably only those regulations, making "conflicting municipal assertion of local . . . authority over wind-blown billboards . . . improper and violative of the preemption intended by the Legislature." The briefest reading of the *Traverso* passage establishes that the court "determined" no such thing. What the court decided was the constitutionality of section 5463 in litigation between a billboard owner and CalTrans. There was no actual dispute presented to the court, or decided by it, involving either the scope of local regulation over billboards or whether restoration of outdoor advertising displays blown over by wind constitutes customary maintenance with the meaning of Regulation 2270. *Traverso* therefore cannot be viewed as

authority for this controversy between the City and Viacom. (E.g., *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1076 [135 Cal.Rptr.2d 361, 70 P.3d 351]; *In re Chavez* (2003) 30 Cal.4th 643, 656 [134 Cal.Rptr.2d 54, 68 P.3d 347].) If anything, in several decisions the Supreme Court has been at pains to recognize that the State Act does not displace all local regulatory power. (See *Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848, 871–880 [164 Cal.Rptr. 510, 610 P.2d 407] (*Metromedia*),[9] *City of Escondido v. Desert Outdoor Advertising, Inc.* (1973) 8 Cal.3d 785, 791, fn. 6 [106 Cal.Rptr. 172, 505 P.2d 1012].)

Nor will Viacom prevail by pointing to section 5401, which provides in pertinent part: "No advertising structure shall be placed unless it is built to withstand a wind pressure of 20 pounds per square foot of exposed surface." This hardly demonstrates an intent by the Legislature to occupy the entire field of the details of billboard construction. Such a construction cannot be squared with the Legislature's announcement in section 5228 that the State Act was intended "to establish *minimum* standards" (italics added). This can be illustrated by the Uniform Sign Code promulgated by the International Conference of Building Officials and adopted by the City. The City's Sign Code defines a billboard as a "ground sign." (Arcata Sign Code, § 208-G.) Ground signs are required to be designed and constructed in accordance with chapter 4 of the code. (Arcata Sign Code, §§ 701–702.) Chapter 4 deals not only with "wind loads," but also with "seismic loads" and the "combined" wind and seismic loads as set out in chapter 16 of the Uniform Building Code (Arcata Sign Code, §§ 401.2–401.4; see fn. 2, *ante*). Chapter 4 also specifies the allowable vertical and horizontal stresses, the standards for materials used, and how signs are to be anchored, again as specified in chapter 16 of the Uniform Building Code. (Arcata Sign Code, §§ 401.5, 402.3, 402.6.) The Sign Code in effect incorporates by reference the requirements spelled out in far greater detail in the Building Code (which, as already mentioned, has already been required by the state; see fn. 2, *ante*.) The City's Sign Code provisions do not conflict with the State Act. All of these provisions either address subjects not addressed in the State Act or appear fully compatible

---

[9] *Metromedia, supra,* 26 Cal.3d 848, involved a city ordinance that banned and ordered the uncompensated removal of all billboards of a certain type. The Supreme Court opinion addressed a number of issues, one of which was whether the ordinance was preempted by the State Act. The court held that it was, but only to the extent the removal provision conflicted with the State Act provision (§ 5412) requiring just compensation. Subsequently, considering the sole issue of whether the ordinance violated the First Amendment rights of the billboard owners, the United States Supreme Court reversed the decision of the California Supreme Court. (*Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882].) Because the reversal did not consider the other issues addressed by the California Supreme Court, the discussion of the California Supreme Court remains valid. (See *City of Salinas v. Ryan Outdoor Advertising, Inc.* (1987) 189 Cal.App.3d 416, 422–423 [234 Cal.Rptr. 619].)

with the State Act's declared intent to establish only minimum standards, with the clear implication that additional input could come from cities and counties.

 In light of the foregoing, the inescapable conclusion is that the State Act not only does not categorically prohibit local legislation, it explicitly and repeatedly invites augmentation from local authorities. So long as local action does not authorize or compel a specific trespass upon a subject reserved to the state (see *Metromedia, supra,* 26 Cal.3d 848 [municipal ordinance banning billboards preempted to extent it did not allow for compensation as required by State Act]; *People ex rel. Dept. of Transportation v. Outdoor Media Group* (1993) 13 Cal.App.4th 1067 [17 Cal.Rptr.2d 19] [CalTrans can order removal of billboards erected without its permits]; *Dean W. Knight & Sons, Inc. v. State of California ex rel. Dept. of Transportation* (1984) 155 Cal.App.3d 300 [202 Cal.Rptr. 44] [county cannot authorize erection of billboard in absence of CalTrans permit]), local authority remains unimpaired. That is not threatened here. The ordinances the City is attempting to enforce do not contradict any provision of the State Act or compromise a paramount state concern. (*Sherwin-Williams, supra,* 4 Cal.4th 893, 897–898.) The ordinances "[do] not mandate what state law expressly forbids, nor [do they] forbid what state law expressly mandates." (*Great Western Shows, Inc. v. County of Los Angeles, supra,* 27 Cal.4th 853, 866.) The City's ordinances are not inimical to the State Act; on the contrary, they appear to be just the sort of local legislation that the State Act positively anticipates if not encourages. (*Sherwin-Williams, supra,* 4 Cal.4th 893, 897–898.) Accordingly, we hold that the State Act cannot be deemed either expressly or impliedly to displace the traditional regulatory power of cities and counties, and therefore it does not preempt the City's efforts to enforce the permit requirements of its building code and sign code. (E.g., *IT Corp. v. Solano County Bd. of Supervisors, supra,* 1 Cal.4th 81, 94, fn. 10; *Malish v. City of San Diego* (2000) 84 Cal.App.4th 725, 729–730 [101 Cal.Rptr.2d 18]; *Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1120–1121, 1125–1126 [67 Cal.Rptr.2d 420]; *Korean American Legal Advocacy Foundation v. City of Los Angeles* (1994) 23 Cal.App.4th 376, 393 [28 Cal.Rptr.2d 530].)

As previously mentioned, Viacom never applied for the permit required by the City. By virtue of the trial court's decision, the City's permit process was never commenced or concluded with the administrative appeal allowed by the City's Building Code. (Cal. Code Regs., tit. 24, § 105.1; Health & Saf. Code, § 18945, subd. (b) [additional appeal to California Building Standards Commission permitted if issue has statewide significance].) Until this administrative process is completed, any claim Viacom might have for damages is premature. (E.g., *Monterey v. Del Monte Dunes at Monterey, Ltd.* (1999) 526 U.S. 687, 721 [143 L.Ed.2d 882, 119 S.Ct. 1624]; *United States v. Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121, 126–127 [88 L.Ed.2d

419, 106 S.Ct. 455]; *Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 195 [87 L.Ed.2d 126, 105 S.Ct. 3108]; *Agins v. Tiburon* (1980) 447 U.S. 255, 262–263 [65 L.Ed.2d 106, 100 S.Ct. 2138], overruled on another point in *Lingle v. Chevron U.S.A., Inc.* (2005) 544 U.S. 528, 531–532 [161 L.Ed.2d 876, 125 S.Ct. 2074].)

The judgment is reversed.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied July 7, 2006, and respondent's petition for review by the Supreme Court was denied August 23, 2006, S145137. Corrigan, J., did not participate therein.