Filed 10/24/16

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| ARTHUR D'EGIDIO, as co-trustee etc., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SANTA CLARITA, <br><br> Defendant and Respondent. | B269095 <br><br> (Los Angeles County <br> Super. Ct. No. BC549246) |

      APPEAL from a judgment of the Superior Court for Los Angeles County, Gail R. Feuer, Judge. Affirmed.

      Callanan, Rogers & Dzida and Joseph S. Dzida for Plaintiffs and Appellants.

      Burke, Williams & Sorensen, Joseph M. Montes and Joseph P. Buchman for Defendant and Respondent.

The Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq. (the Act))[1] regulates advertising displays (i.e., billboards)[2] adjacent to interstate or primary highways in California. Section 5270 of the Act states: "The regulation of the placing of advertising displays by this chapter, insofar as such regulation may affect the placing of advertising displays within view of the public highways of this state in unincorporated areas, shall be exclusive of all other regulations for the placing of advertising displays within view of the public highways of this state in unincorporated areas whether fixed by a law of this state or by a political subdivision thereof." Despite this statement of exclusivity, the Act also contains several provisions that authorize counties and cities to enact regulations or ordinances affecting the placing of billboards, imposing restrictions on advertising displays adjacent to any highway, or requiring permits and/or licenses for the placing of billboards in view of any highway. (E.g., §§ 5227, 5230, 5231.)

The primary question presented in this case is whether section 5270 precludes application of county or city billboard ordinances with respect to a billboard that was placed in an area that was unincorporated at the time of its placement.[3] The trial court concluded that in light of the entire statutory scheme, section 5270 does not preempt county- or city-enacted limitations on

---

[1]    Further undesignated statutory references are to the Business and Professions Code.

[2]    We use the terms "advertising displays" and "billboards" interchangeably throughout this opinion.

[3]    Although other issues have been raised in this appeal, we find that none of those issues has merit in light of our resolution of the primary question.

billboards in unincorporated areas that are stricter than the limitations set forth in the Act. We agree, and affirm the judgment in favor of City of Santa Clarita (City).

## BACKGROUND

The relevant facts of this case are for the most part undisputed. Plaintiffs Arthur D'Egidio, co-trustee of the Restated D'Egidio Trust dated October 26, 1989, and Carol A. D'Egidio, trustee of the Carol A. D'Egidio Irrevocable Trust dated July 19, 1996, are co-owners, along with other members of the D'Egidio family, of a parcel of property that currently is within the city limits of City. The D'Egidios bought the property in May 1984 from Kaufman & Broad/Marion Land Company. At the time of the purchase, the property was in an unincorporated area of Los Angeles County (County).

State Route 14, also known as the Antelope Valley Freeway, runs along the southern border of the property. Before the D'Egidios bought the property, Kaufman & Broad had erected a billboard nine feet from the freeway, designed to be viewed from the freeway, that was used to advertise new homes it was developing in the subdivision located across the street from the property. When Kaufman & Broad conveyed the property to the D'Egidios, it reserved an easement to allow it to maintain the billboard for three years, to 1987. Throughout its management of the billboard, Kaufman & Broad used the billboard solely to advertise its new development.

After Kaufman & Broad's easement expired, Arthur D'Egidio took over the management of the billboard. He obtained an outdoor advertising permit from the California Department of Transportation (Caltrans) and began leasing out the billboard for general commercial advertising.

3

Under County ordinances as they existed in 1987, signs advertising subdivisions that were being offered for sale or lease for the first time were allowed to be placed on the subdivision property, oriented to be read from the street or highway, without any restriction as to the distance from the street or highway. (L.A. County Code, §§ 22.08.190 [definition of "Subdivision sales sign"], 22.52.980 [rules governing subdivision sales signs].) A sign that advertised a business, profession, product, or service that was not offered or sold on the property on which the sign was placed (i.e., an "outdoor advertising sign"), however, could not be placed within 660 feet of the edge of right-of-way of a freeway or scenic highway if the sign was designed to be viewed primarily by persons traveling on that freeway or highway. (L.A. County Code, §§ 22.08.190 [definition of "Outdoor advertising sign"], 22.52.840, subd. (D) [placement condition on outdoor advertising sign].)

City, which had incorporated in December 1987, annexed the area in which the property was located in 1990. At the time of its incorporation, City adopted as City's ordinances all ordinances codified in the Los Angeles County Code. In 1989, City amended its sign ordinances to require a conditional use permit to erect or maintain any outdoor advertising sign, and to prohibit such signs within 1000 feet of the edge of right-of-way of a freeway or scenic highway if the sign was designed to be viewed partially or primarily by persons traveling on the freeway or highway. (Santa Clarita Ord. No. 89-17, amending Santa Clarita Mun. Code, § 22.52.840.) Those requirements remained in effect (codified in 1992 as Santa Clarita Mun. Code, § 17.19.050 (A), (E)) until 2003, when City again amended its sign regulations to provide that outdoor advertising signs (which it called "off-site signs") were not permitted at all, except that such signs that were lawfully erected before the effective date of the amendment could be lawfully maintained as a legal

4

nonconforming use. (Santa Clarita Ord. No. 03-17, amending and restating Santa Clarita Mun. Code, §§ 17.19.240 (M) [prohibiting off-site signs, with exceptions for legal nonconforming use], 17.19.160 [allowing existing lawfully erected signs as legal nonconforming use].) The provisions prohibiting off-site signs, but permitting such signs that previously were lawfully erected to be maintained as legal nonconforming uses currently are found at subdivisions (M) and (U)(12) of Santa Clarita Municipal Code section 17.51.080. However, in 2014, City passed an ordinance that amended the regulations and required, among other things, the removal within five years of offsite signs that were lawfully erected before November 13, 1990. (Santa Clarita Ord. No. 14-01, amending Santa Clarita Mun. Code, § 17.05.050.)

In 2007, City asserted (for the first time) that the D'Egidios' billboard was illegal because it was not properly permitted. City and the D'Egidios entered into negotiations concerning the billboard, but failed to reach a settlement.[4] On May 27, 2014, City sent a letter to counsel for the D'Egidios, stating that, in accordance with Santa Clarita Municipal Code section 17.05.050 (B)(3),[5] the D'Egidios were required to remove their billboard by April 24, 2019.

---

[4] The D'Egidios allege a settlement was reached, but admit that City declined to sign the proposed settlement agreement.

[5] City quoted Santa Clarita Municipal Code section 17.05.050 (B)(3) as follows: "In the case of outdoor advertising signs or structures (i.e., billboards and other off-site signs) in non-residential zones lawfully erected prior to November 13, 1990, except where approved pursuant to Sections 17.26.100 (Billboard Reduction and Relocation Agreement) or 17.28.100 (Development Agreements), such signs and structures shall be discontinued and removed within five (5) years of the effective date of this subsection (which is 04-24-2014) pursuant to and as allowed by California *Business and Professions Code* Section 5412."

5

The D'Egidios filed a complaint for declaratory relief three weeks later. They alleged that at all times during its existence, the billboard was authorized by permits issued by Caltrans, which they believed in good faith were the only permits required. They also alleged on information and belief that before City was incorporated, County did not require any permit to maintain the billboard and that, even if County did require such a permit, that requirement was preempted by state law. Finally, the D'Egidios alleged that City's demand for removal of the billboard is barred by the doctrines of laches and estoppel. They asked for a judicial determination as to the rights and obligations of the parties regarding the billboard.

After City's demurrer to the complaint was overruled and its motion to strike portions of the complaint was denied, City filed a cross-complaint against the D'Egidios, alleging that the billboard was not lawfully erected under the Act and the County Code in effect in 1987, and therefore cannot be deemed a legal nonconforming use. It alleged claims for violation of the Santa Clarita Municipal Code and maintenance of a public nuisance, and sought declaratory relief and an injunction prohibiting the D'Egidios from maintaining the billboard. City also sought attorney fees under Santa Clarita Municipal Code section 23.30.130.

City filed a motion for summary judgment on the complaint and cross-complaint, contending that (1) the Act does not preempt local government regulations regarding billboards; (2) the undisputed evidence shows that the D'Egidios' billboard did not comply with the Los Angeles County Code when its use was modified in 1987 from a subdivision sales sign to an outdoor advertising sign; (3) because the billboard was not lawfully erected, it is unlawful under City's municipal code and must be removed; and (4) City

cannot be estopped from enforcing its municipal code with regard to the billboard. The D'Egidios did not dispute in any meaningful way City's facts in support of its motion.[6] The trial court granted summary judgment in favor of City in a detailed ruling. It entered judgment finding that the billboard was not lawfully erected in 1987 when the D'Egidios changed its use to an outdoor advertising sign because its placement violated Los Angeles County Code section 22.52.840, it is prohibited under the Santa Clarita Municipal Code, and it constitutes a public nuisance. The court ordered that the D'Egidios were permanently enjoined and prohibited from maintaining the billboard on their property.

City moved for its attorney fees under California Rules of Court, rule 3.1702, Code of Civil Procedure section 1033.5, subdivision (a)(10)(B), Government Code section 38773.5, and Santa Clarita Municipal Code section 1.01.220(D). The court granted City's motion, awarding City attorney fees in the amount of $48,633.20. The D'Egidios timely filed notices of appeal from the judgment and the postjudgment order granting City attorney fees.

## DISCUSSION

On appeal, the D'Egidios contend the trial court erred in granting summary judgment because (1) the court improperly relied upon County and

---

[6] For example, the D'Egidios disputed certain facts related to technical issues regarding Kaufman & Broad's placement and maintenance of the billboard and the 1987 Los Angeles County Code, but some of those disputes actually are legal disputes and the others are not relevant to the issues to be determined by the summary judgment. The D'Egidios also presented additional facts, which they asserted precluded summary judgment; most of those facts either were not disputed by City or were not supported by the evidence in light of City's sustained objections.

7

City regulations, which were preempted by section 5270, to conclude that the billboard was illegal; (2) the court failed to apply the rebuttable presumption of legality as set forth in section 5216.1; (3) there were disputed issues of fact regarding whether the doctrines of laches and estoppel precluded City from asserting the billboard is illegal. The D'Egidios also challenge the award of attorney fees to City on the grounds that the award penalizes citizens who seek guidance in a declaratory relief action regarding an issue of first impression concerning an inconsistent statutory scheme, and, to the extent the award was based upon City's nuisance claim, the claimed nuisance was pretextual.

A. *Section 5270 Does Not Preempt Local Regulations That Are More Restrictive Than the Act*

The D'Egidios observe in the appellants' opening brief that "the meaning and interpretation of the exclusivity provision [set forth in section 5270] is the primary question" in this appeal. We agree.

""""As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate to law's purpose."""" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 803 (*Pacific Palisades*).) Ordinarily, """"[i]f the statute's text evinces an unmistakable plain meaning, we need go no further."""" (*Ibid.*) In this case, there is no question that the language of section 5270 -- that the Act's regulations affecting the placing of advertising displays within view of public highways in unincorporated areas "shall be exclusive of all other regulations for the placing of advertising displays within view of the public highways of this state in unincorporated areas whether fixed by a law of this state or by a political subdivision thereof" -- appears to preclude the

8

application of any county or city regulation to advertising displays within view of public highways in unincorporated areas.  This seemingly unambiguous language, however, is made ambiguous by several other provisions of the Act that expressly allow, or contemplate, the enactment and enforcement by counties and/or cities of local regulations affecting the placing of advertising displays.

For example, section 5227 appears to directly contradict the exclusivity provision of section 5270.  It provides, in relevant part:  "It is the intention of the Legislature to occupy the whole field of regulation by the provisions of this chapter *except that nothing in this chapter prohibits . . . the passage by any county of reasonable land use or zoning regulations affecting the placing of advertising displays* in accordance with the provisions of the Planning Law, Chapter 1 (commencing with Section 65000) of Title 7 of the Government Code, relating to zoning . . . ."  (§ 5227, italics added.)  Similarly, section 5230 contradicts the exclusivity provision of section 5270 by expressly granting cities and counties the authority to pass such regulations or other ordinances:  "The governing body of any city, county, or city and county may enact ordinances, including, but not limited to, land use or zoning ordinances, imposing restrictions on advertising displays adjacent to any street, road, or highway equal to or greater than those imposed by this chapter, if Section 5412 is complied with.[7]  No city, county, or city and county may allow an advertising display to be placed or maintained in violation of this chapter."  (§ 5230.)  And section 5231 grants cities and counties authority to enact

---

**7**     Section 5412 provides that an advertising display that was lawfully erected in compliance with state laws and local ordinances in effect when the displays were erected cannot be compelled to be removed or its customary use be limited without payment of compensation under the eminent domain law.

9

ordinances requiring licenses and/or permits in addition to those imposed by the Act for placing of advertising displays in view of any highway.

Other provisions of the Act make clear that those locally-enacted ordinances apply to all advertising displays adjacent to highways. For example, section 5229 states that "[t]he provisions of this chapter shall not be construed to permit a person to place or maintain in existence on or adjacent to any street, road or highway, including any interstate or state highway, any outdoor advertising prohibited by law or by any ordinance of any city, county or city and county." Similarly, section 5366 provides that "[t]he issuance of a permit pursuant to this chapter does not allow any person to erect an advertising display in violation of any ordinance of any city, county, or city and county." That the Legislature contemplated that cities and counties would enact ordinances regulating outdoor advertising displays also is shown in its declaration of intent regarding the Act: "It is declared to be the intent of the Legislature in enacting the provisions of this chapter regulating advertising displays adjacent to highways included in the national system of interstate and defense highways or the federal-aid primary highway system to establish minimum standards with respect thereto." (§ 5228.) In other words, the Legislature intended that counties and cities could enact regulations that were more restrictive than the regulations under the Act.

Given these provisions of the Act -- which make no distinction between billboards in incorporated areas and in unincorporated areas -- it seems clear that the Legislature did not intend that section 5270 would preclude the application of all local ordinances to billboards in unincorporated areas. Therefore, to determine what the Legislature did intend, "'we may "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous

10

administrative construction, and the statutory scheme of which the statute is a part.'" [Citation.]" (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 803.)

1. *History of the Act*

We begin our inquiry with the original codification of the Act in 1939.[8] (Stats. 1939, ch. 32, § 1, pp. 333-340.)  As originally codified, the Act was very limited in scope.  It applied "only to the placing of advertising displays within view of the public highways located in any of the territory of the State of California, other than the territory within incorporated cities and towns." (Stats. 1939, ch. 32, § 1, p. 334, adding § 5226.)  It required persons who engaged in the business of outdoor advertising to pay a license fee and to obtain a permit from the director of the Department of Public Works to place an advertising display, it regulated the size, placement, and types of advertising displays allowed (almost all of which regulations were directed at ensuring the safety of travelers on the highway), and it set forth the crimes and penalties for violations of the Act.  (Stats. 1939, ch. 32, § 1, pp. 335-339, adding former §§ 5240-5314.)

Only two of the provisions quoted above were in the Act in 1939.  The language now found in section 5270 was found in former section 5225 of the original codification.  (Stats. 1939, ch. 32, § 1, p. 334, adding § 5225  ["The regulation of the placing of advertising displays by this chapter, in so far as such regulation may affect the placing of advertising displays within view of the public highways of this State in unincorporated areas, shall be exclusive of all other regulations for the placing of advertising displays within view of

---

[8]    The Act originally was enacted in 1933 (Stats. 1933, ch. 341, p. 938), but was not codified until 1939.

11

the public highways of this State in unincorporated areas whether fixed by a law of this State or by a political subdivision thereof"].)  The language from section 5227 quoted above also appeared in former section 5227 of the 1939 codification, although it cited to the zoning statutes in effect at that time:  "It is the intention of the Legislature to occupy the whole field of regulation by the provisions of this chapter except that nothing in this chapter prohibits . . . the passage by any county of reasonable land use or zoning regulations affecting the placing of advertising displays in accordance with the provisions of Chapter 838 of the Statutes of 1929, relating to zoning."  (Stats. 1939, ch. 32, § 1, p. 334, adding former § 5227.)  In a subsequent amendment made during the 1939 legislative session, the Legislature made clear that billboards were required to comply with county zoning ordinances by adding the following paragraph to former section 5268:  "The issuance of a permit [under the Act] does not affect the obligation of the owner of the advertising display to comply with a zoning ordinance applicable to the advertising display under the provisions of this chapter nor does the permit prevent the enforcement of the applicable ordinance by the county."  (Stats. 1939, ch. 1121, § 11, p. 3070, amending former § 5268.)

The scope of the Act was significantly expanded in 1964, when the Legislature enacted the Collier-Z'berg Act of 1964.  (Stats. 1964, 1st Ex. Sess., ch. 128, §§ 1-14, pp. 393-397.) The impetus for this expansion came from federal legislation in 1958 that provided a bonus of federal-aid highway funds to states that enacted expanded controls over billboards along interstate highways.  As explained in a report of the Assembly Committee on Natural Resources, Planning, and Public Works (which was chaired by Assemblymember Edwin L. Z'berg), "[a]s the result of intensive study of the subject, the committee recommended enactment of the Collier-Z'berg Act of

12

1964, which, based on the need to restore and preserve scenic resources and urban amenities and contribute to increased traffic safety, established the principle of expanded control of outdoor advertising in California by regulating advertising along interstate highways." (Assem. Com. on Natural Resources, Planning, and Public Works, Rep. on Highway Beautification, etc. (Jan. 1967), Supp. To Appendix to the Journal of the Assembly (1967 Reg. Sess.), p. 9.)  The Collier-Z'berg Act of 1964 thus expanded the scope of the Act to regulate all billboards along interstate highways, not just those in unincorporated areas, except for certain segments of interstate highways that traverse and abut on certain commercial or industrial zones in incorporated municipalities.  (Stats. 1964, 1st Ex. Sess., ch. 128, §§ 2-3, pp. 394-395, adding former §§ 5288, 5288.1.)  To that end, former section 5288 was added to express the purpose of the Act:  "The regulation of advertising structures adjacent to any state highway included in the national system of interstate and defense highways as herein provided is hereby declared to be necessary to promote the public safety, health, welfare, convenience and enjoyment of public travel, to protect the public investment in such highways, to preserve the scenic beauty of lands bordering on such highways, and to insure that information in the specific interest of the traveling public is presented safely and effectively, recognizing that a reasonable freedom to advertise is necessary to attain such objectives." (Stats. 1964, 1st Ex. Sess., ch. 128, §§ 2-3, p. 394, adding former § 5288.)  No changes were made to former section 5225 (now section 5270), nor were there any provisions (other than former section 5227 and former section 5268) related to local ordinances to regulate billboards.

The next significant changes to the Act came in the Collier-Z'berg Act of 1967, which arose out of the passage of the federal Highway Beautification

13

Act of 1965 championed by First Lady Lady Bird Johnson. (https://www.fhwa.dot.gov/infrastructure/beauty.cfm; Stats. 1967, ch. 1408, § 1, p. 3306 ["It is the intention of the Legislature, in enacting this act, to provide for the effective control of outdoor advertising required by the Highway Beautification Act of 1965"].) Among other things, the Collier-Z'berg Act of 1967 amended former section 5226 to provide: "The provisions of this chapter apply only to the placing of advertising displays within view of highways located in unincorporated areas of this state, *except that the placing of advertising displays within 660 feet from the edge of the right-of-way of, and the copy of which is visible from, interstate highways or primary highways, including the portions of such highways located in incorporated areas, shall be governed by this chapter.*" (Stats. 1967, ch. 1408, § 14, p. 3309, amending former § 5226, italics added.)[9]

The Collier-Z'berg Act of 1967 also added former section 5288.7, which declared the Legislature's intent that the provisions of the Act establish minimum standards with respect to regulating billboards adjacent to interstate and primary highways, and authorizing cities and counties to enact ordinances imposing restrictions that were equal to or greater than those imposed by the Act. Importantly, former section 5288.7 also authorized cities and counties to enact such ordinances with respect to billboards adjacent to *any* highway within their boundaries. (Stats. 1967, ch. 1408, § 28.5, p. 3316, adding former § 5288.7 ["It is declared to be the intent of the Legislature in enacting the provisions of this chapter regulating advertising

---

[9]     A provision defining "primary highway" -- "any highway, other than an interstate highway, at any time officially designated as a part of the federal-aid primary system by the director and approved by appropriate authority of the federal government" -- also was added to the Act. (Stats. 1967, ch. 1408, § 4, p. 3307, adding former § 5207.2.)

14

displays adjacent to highways included in the national system of interstate and defense highways or the federal-aid primary highway system to establish minimum standards with respect thereto. The governing body of any city, county, or city and county may enact ordinances, including but not limited to land use or zoning ordinances, imposing restrictions on advertising displays adjacent to any street, road, or highway equal to or greater than those imposed by this chapter. The governing body of any city or city and county may enact ordinances requiring licenses or permits, or both, for the placing of advertising displays in view of any highway, including a highway included in the national system of interstate and defense highways or the federal-aid primary highway system, within its boundaries"].)

In 1970, the entire Act was repealed and replaced, without substantive change, for the purpose of rearranging and renumbering the provisions. (Stats. 1970, ch. 991, §§ 1-2, pp. 1764-1782.) Former section 5225 was enacted, without change, as section 5270. (Stats. 1970, ch. 991, § 2, p. 1768.)

The Act was amended again in 1983. The most significant changes for purposes of this case were the addition of provisions defining "lawfully erected," providing a rebuttable presumption that a billboard was lawfully erected if it had been in existence for at least five years during which no governmental entity provided the owner with written notice stating that that the billboard was not lawfully erected (§ 5216.1), and expressly stating that the issuance of a permit under the Act does not allow any person to place a billboard in violation of local ordinances (§ 5366). (Stats. 1983, ch. 653, §§ 2, 13, pp. 2580, 2582, adding §§ 5216.1, 5366.) In addition, the Legislature amended section 5231 to make clear that a city or county may enact ordinances to require a billboard owner or operator to obtain a license or

15

permit in addition to any license or permit required by the Act.  (Stats. 1983, ch. 653, § 6, p. 2581, amending § 5231.)

As this history shows, the Act went from a very limited statutory scheme to regulate billboards adjacent to highways in unincorporated areas of the state for the purpose of protecting the safety of travelers on public highways, to a wide ranging scheme to regulate billboards adjacent to all highways, not only for safety reasons, but also to "promote the public . . . health, welfare, convenience and enjoyment of public travel, to protect the public investment in such highways, to preserve the scenic beauty of lands bordering on such highways, and to insure that information in the specific interest of the traveling public is presented safely and effectively."  (§ 5226.) Despite the significant change in the scope and purpose of the Act, the Legislature never addressed or amended the exclusivity provision of section 5270, or its apparent contradiction with the language in section 5227 -- that nothing in the Act prohibits counties from regulating the placing of billboards through land use or zoning laws -- even though both provisions have been a part of the Act since its original codification.

2.    *Prior Interpretations*

Although the Legislature has never addressed the apparent contradiction between sections 5270 and 5227 (or the many other provisions allowing local regulation), the Attorney General did so in 1953, in an opinion requested by State Senator Hugh M. Burns.  Senator Burns asked the Attorney General for an opinion regarding whether a county may "enact an ordinance prohibiting billboards within five hundred feet of freeways in unincorporated areas."  (21 Ops.Cal.Atty.Gen. 43 (1953).)

16

In answering the Senator's question, the Attorney General noted that, despite the exclusivity provision of (former) section 5225 (now section 5270), there were two other provisions of the Act that demonstrated the Legislature's intent to allow counties to regulate billboards through zoning ordinances:  section 5227 and (former) section 5268, which at the time of the Attorney General's opinion provided in relevant part:  "The issuance of a permit does not affect the obligation of the owner of the advertising display to comply with a zoning ordinance applicable to the advertising display under the provisions of this chapter nor does the permit prevent the enforcement of the applicable ordinance by the county." (Stats. 1939, ch. 1121, § 11, p. 3070, amending former § 5268.)  From these provisions, the Attorney General concluded that "it is clear that a county by appropriate ordinance may enforce any or all of the provisions of the Outdoor Advertising Act.  Further, a county may adopt reasonable land use or zoning regulations to affect the placing of advertising displays in accordance with the provisions of chapter 838 of the Statutes of 1929 relating to zoning." (21 Ops.Cal.Atty.Gen. 43, 44.)

Addressing the apparent contradiction between this conclusion and the exclusivity provision, the Attorney General examined the regulations set forth in the Act, and found that the Act "prohibits placing signs in designated locations or under stated conditions, all of which, with one inapplicable exception . . . , are concerned with safety, not only of the signs themselves, but particularly as they might affect traffic on highways." (21 Ops.Cal.Atty.Gen. 43, 45.)  Therefore, the Attorney General concluded that the Act "taken as a whole appears to be a clear intention on the part of the Legislature to place with the State itself exclusive domination and control of advertising upon the public highways in unincorporated areas from the standpoint of safety, that is, to provide State regulation so that advertising

17

structures will not interfere with the safe use of such highways. This is a proper use of the police power of the State. [¶] However, the act recognizes the need and authorizes counties to regulate advertising displays as a part of county zoning. Thus, it seems clear that in unincorporated areas a county may in the course of district zoning, as commonly practiced, control advertising." (*Ibid.*)

The only case we have found in which a court addressed the exclusivity provision and its apparent contradiction with section 5227 and other provisions allowing local regulation of billboards is *Viacom Outdoor, Inc. v. City of Arcata* (2006) 140 Cal.App.4th 230 (*Viacom*). In that case, the City of Arcata sought to enforce its ordinances requiring permits before Viacom could rebuild its wind-destroyed billboards. (*Id.* at p. 234.) Viacom contended that the Act allowed cities only the power to regulate the location and placement of new billboard structures and otherwise preempted the entire field of regulation of billboards. (*Id.* at pp. 234-235.) The trial court agreed with Viacom, and found that the Act (and regulations promulgated thereunder) set forth the criteria by which billboards may be re-erected, and preempts the field. (*Id.* at p. 235.)

The appellate court reversed. The court noted that, as originally codified, "the Legislature intentionally extended the exclusive reach of the . . . Act only to counties, and only to the unincorporated parts of counties adjacent to what were then state highways. These provisions [i.e., former section 5225 and former section 5227], read together did not purport to extend any exclusive state power to state highways located within cities [such as the incorporated City of Arcata]." (*Viacom*, at p. 238.) The court found that, in light of the many provisions of the Act that expressly allowed counties and cities to enact ordinances regulating billboards or required

18

compliance with those ordinances, "the Legislature clearly contemplated that local regulation would augment the State Act, and might in some instances go beyond it." (*Id.* at p. 241.)

3.     *Section 5270 Must Be Interpreted Not to Preempt Local Ordinances*

The D'Egidios seize upon the language in *Viacom* that "the Legislature intentionally extended the exclusive reach of the . . . Act only to counties, and only to the unincorporated parts of counties adjacent to what were then state highways" (*Viacom*, *supra*, 140 Cal.App.4th at p. 238) to argue that although the Act is not exclusive to the extent it applies to billboards in incorporated areas, it *is* exclusive with regard to billboards in unincorporated areas. We disagree.

First, this passage in *Viacom* is dictum, inasmuch as the billboards at issue in that case were located in an incorporated city. But more importantly, the court's observation was made with regard to the Act as originally codified in 1939. (*Viacom*, *supra*, 140 Cal.App.4th at pp. 237-238.) The court did not discuss the Attorney General's conclusion -- with which we agree -- that the Act (as it existed in 1953) placed with the state exclusive control of billboards in unincorporated areas *from the standpoint of safety*, but authorized counties to control billboards in unincorporated areas through zoning ordinances. (21 Ops.Cal.Atty.Gen. 43, 45.) Moreover, as we have discussed, the Act has undergone significant changes, both in scope and purpose, since the Act was codified in 1939. The fact that the Legislature has added even more provisions allowing counties and cities to enact and enforce regulations that are as restrictive or more restrictive than the regulations set forth in the Act reinforces our view that the Attorney General's conclusion

19

was correct, and that section 5270 does not preclude application of county regulations to billboards in unincorporated areas.

We recognize that under our interpretation, the exclusivity provision of section 5270 has little effect. At most, it might preclude a county regulation that related solely to the safety of travelers on state highways. But it is not this Court that has limited the exclusivity provision, it is the Legislature that has expanded and made clear the authority of counties to regulate billboards within its boundaries, including in unincorporated areas.

B.      *The Trial Court Correctly Found the D'Egidios' Billboard Was Illegal*

As noted, the trial court found that the D'Egidios' billboard was illegal because it was not lawfully erected in 1987 under the Los Angeles County Code, and therefore is prohibited under the Santa Clarita Municipal Code. The D'Egidios argue that the trial court made two errors (other than its conclusion that County's regulations were not preempted by section 5270) in making this finding. First, they argue that the court improperly found that the billboard, which was lawful when it was originally erected by Kaufman & Broad, became unlawful when the D'Egidios took over control of the billboard and began leasing it for general commercial advertising. Second, they argue the court failed to apply the presumption of legality set forth in section 5216.1. Neither argument has merit.

1.      *The Change in Use in 1987 Violated the County Code*

In 1987, the D'Egidios changed the use of the billboard, from advertising the sales of new homes in the subdivision across the street from the billboard (while Kaufman & Broad controlled the billboard), to general commercial advertising. Under the Los Angeles County Code  in effect at

20

that time, billboards used for general commercial advertising could not be placed less than 660 feet of the edge of right-of-way of a freeway if designed to be viewed primarily by persons travelling on the freeway, unless the owner or operator obtained a conditional use permit allowing a deviation from this restriction. (L.A. County Code, §§ 22.08.190 [definition of "Outdoor advertising sign"], 22.52.840, subd. (D) [placement condition on outdoor advertising sign]; 22.56.110 [regulations apply unless modified by a conditional use permit].)

The D'Egidios do not dispute that the billboard is only nine feet from the Antelope Valley Freeway right of way. Nor do they dispute that they did not seek approval or a conditional use permit from County with respect to the billboard. Instead, they appear to argue that, because the billboard was legal when it originally was erected by Kaufman & Broad (because the provisions governing subdivision sales signs, section 22.52.980 of the Los Angeles County Code, did not impose any restriction with regard to the placement of the sign relative to the right-of-way of a freeway), it was "lawfully erected" and its change of use in 1987 could not cause the billboard to be unlawfully erected. They are incorrect.

The Act specifically provides that when the use of a billboard is modified after it was erected in a manner that causes it to become illegal under state or local ordinances, the billboard no longer is "lawfully erected." (§ 5216.1 ["'Lawfully erected' means, in reference to advertising displays, advertising displays which were erected in compliance with state laws and local ordinances in effect at the time of their erection . . . *except that the term does not apply to any advertising display whose use is modified after erection in a manner which causes it to become illegal*"], italics added.) Therefore, the

trial court did not err in finding that, as of the change in use of the billboard in 1987, the billboard was not lawfully erected.

### 2. *City Rebutted the Presumption of Legality*

In addition to defining "lawfully erected," section 5216.1 provides "a rebuttable presumption pursuant to Section 606 of the Evidence Code that an advertising display is lawfully erected if it has been in existence for a period of five years or longer without the owner having received written notice during that period from a governmental entity stating that the display was not lawfully erected." The D'Egidios argue that it presented undisputed facts that the billboard had been in existence for more than 20 years and neither City nor County provided written notice that it was not lawfully erected, and therefore the trial court erred by failing to apply this presumption, which the D'Egidios contend would raise disputed issues precluding summary judgment. They are mistaken.

What the D'Egidios fail to acknowledge is that the presumption is a *rebuttable* presumption pursuant to Evidence Code section 606. Under that statute, "[t]he effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.) Thus, the D'Egidios' undisputed evidence simply placed on City the burden to prove that the billboard was *not* lawfully erected. City met its burden by presenting undisputed facts that the D'Egidios modified the use of the billboard in 1987 in a manner that made it illegal under the Los Angeles County Code in effect at that time. Therefore, the presumption no longer applied.

C.      *The D'Egidios Failed to Raise a Disputed Issue of Fact Regarding*
        *Estoppel or Laches*

In opposition to the summary judgment motion, the D'Egidios contended there were triable issues of fact as to whether the doctrines of estoppel or laches applied because City's 17-year delay has caused them prejudice in that evidence to show their compliance with the Act has been lost.  The trial court found that equitable estoppel was inapplicable because the billboard was an ongoing nuisance and because, absent a showing of prejudice, the D'Egidios' reliance on mere inaction by City is insufficient to establish estoppel.  The court also found that laches did not apply because the D'Egidios failed to present evidence of any prejudice caused by the delay.

On appeal, the D'Egidios argue that estoppel and laches apply in this case because there were disputed issues of fact regarding whether the injustice to them in allowing City to declare the billboard a public nuisance after so many years outweighed the impact on public interest and policy if City is barred from seeking to declare the billboard a public nuisance.  They contend they raised a triable issue as to whether they were prejudiced by City's delay because Arthur D'Egidio testified that he had lost memory in the passing decades and could no longer investigate to find evidence lost in the passage of time.  We are not persuaded.

In their appellants' opening brief, the D'Egidios make little distinction between estoppel and laches in arguing that the trial court erred in finding neither doctrine applies.  For ease of reference, we will address each doctrine separately.

""Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel:  (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon,

23

or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." [Citation.]' [Citation.] Estoppel will not apply if any one of the elements is missing. [Citation.] [¶] When equitable estoppel is asserted against a governmental agency, there are additional considerations. As explained in the seminal case *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423] (*Mansell*): 'The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and . . . the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.' [Citation.] Yet, 'an estoppel will not be applied against the government if to do so would effectively nullify "a strong rule of policy, adopted for the benefit of the public . . . ."' [Citation.] In *Mansell*, our Supreme Court noted that the government will be estopped only in an 'exceptional case.' [Citation.]" (*West Washington Properties, LLC v. Department of Transportation* (2012) 210 Cal.App.4th 1136, 1145-1146.)

The present case is not an exceptional case. In fact, in finding that the D'Egidios failed to show prejudice as a result of City's inaction, the trial court found that the D'Egidios failed to present evidence to satisfy one of the four elements necessary to apply estoppel: that the D'Egidios relied upon City's inaction to their detriment. "'The essence of an estoppel is that the party to be estopped has by false language or conduct "led another to do that which he [or she] would not otherwise have done and as a result thereof that he [or she] has suffered injury." [Citation.]' [Citation.]" (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1315.) The only alleged injury the D'Egidios

24

identify in their appellants' opening brief is that they now face a monetary judgment (i.e., attorney fees owed to City) and have lost the only income they earn from their property. But those alleged injuries were not caused by the D'Egidios' reliance on City's inaction; they were caused by the fact that their billboard was not lawfully erected and therefore is a public nuisance (see § 5461 ["All advertising displays which are placed or which exist in violation of the provisions of this chapter are public nuisances and may be removed by any public employee as further provided in this chapter"]), which City sought to abate over the D'Egidios' opposition. Therefore, the trial court did not err in concluding that, based upon the undisputed facts, estoppel did not apply.

The trial court also did not err in finding there was no evidence presented showing that the D'Egidios were prejudiced by City's delay in seeking to have the billboard removed as a public nuisance. "[T]he affirmative defense of laches requires unreasonable delay in bringing suit 'plus either acquiescence in the act about which plaintiff [or cross-complainant] complains or prejudice to the defendant [or cross-defendant] resulting from the delay.' [Citation.] Prejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue. [Citation.]" (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624.)

The D'Egidios' contention that their evidence that the delay resulted in the loss of evidence was sufficient to raise a triable issue regarding prejudice is unconvincing. The undisputed evidence presented to the trial court established that the change in use of the billboard in 1987 caused the billboard to be in violation of the Los Angeles County Code, and the D'Egidios never sought to get County's approval of the billboard. The D'Egidios do not explain, and we cannot fathom, what evidence there could have been that

25

was lost during the delay that could show that the billboard did not violate the County Code. Therefore, the trial court correctly found that laches did not apply.

D.     *The Award of Attorney Fees Was Allowed Under the Statutes*

The D'Egidios contend the trial court should not have awarded attorney fees to City because doing so penalized them for seeking guidance in the form of declaratory relief regarding an inconsistent statutory scheme. They also contend the court erred by awarding fees because the basis for City's claim that the billboard was a public nuisance was "a technicality and fiction" or pretextual. Neither contention prevails.

With regard to the first contention, we agree with the trial court's observation that City is entitled by statute to recover its attorney fees incurred in prosecuting its nuisance claim,[10] and the fact that City *also* prevailed on the D'Egidios' declaratory relief claim does not mean that City no longer is entitled to its attorney fees on its nuisance claim. As the trial court noted, City's work opposing the D'Egidios' declaratory relief claim was for the most part indistinguishable from its work prosecuting its nuisance claim, since the issues involved in both cases were identical. However,

---

[10]     By statute, attorney fees are allowed to the prevailing party as costs when authorized by contract, statute, or law (Code Civ. Proc., § 1033.5, subd. (a)(10)), and a city may, by ordinance, provide for the recovery of attorneys' fees by the prevailing party in any action to abate a nuisance (Gov. Code, § 38773.5, subd. (b)). Santa Clarita Municipal Code section 1.01.220(D) provides that, "[p]ursuant to Government Code Section 38773.5, in any action . . . brought to abate a public nuisance, the prevailing party will be entitled to recover attorneys' fees; provided, that attorneys' fees will only be available in those actions or proceedings in which the City has provided notice at the commencement of such action . . . that it intends to seek and recover its own attorneys' fees. In no action . . . shall an award of attorneys' fees exceed the amount of reasonable attorneys' fees incurred by the City in the action. . . ."

26

because City's municipal code allows recovery of attorney fees to the prevailing party in nuisance cases only when City has provided notice that it will be seeking to recover its attorney fees, the court properly limited the fee award to attorney fees incurred after City filed its cross-complaint. We find no error in this respect.

Nor do we find error in the trial court's rejection of the D'Egidios' contention that City was not entitled to attorney fees because the nuisance claim was a "technicality" and pretextual. In making this argument, the D'Egidios rely upon *Hurwitz v. City of Orange* (2004) 122 Cal.App.4th 835, 852-853 (*Hurwitz*). Their reliance is misplaced.

In *Hurwitz*, the City of Orange violated a preliminary injunction not to build in a certain area or otherwise interfere with the property owner's existing parking access. (*Hurwitz, supra*, 122 Cal.App.4th at p. 838.) After it built a permanent curb that entirely foreclosed the property owner's access to his parking space, the city held a hearing, which was not properly noticed under the city's ordinance, and declared the use of the parking space a nuisance. (*Id.* at pp. 841-842.) The city subsequently filed a cross-complaint in eminent domain in the ongoing injunctive relief case. (*Id.* at p. 842.) Following trial, the trial court ruled that the use of the parking space was not a nuisance that the city could summarily and unilaterally abate, and awarded the property owner damages for the decline in value to his property. (*Ibid.*)

On appeal, the appellate court rejected the city's argument that the damage award was improper because the city could have brought a nuisance abatement action, and the trial court would have been obligated to find there was a nuisance because the city council's declaration of a nuisance was supported by the testimony of a traffic consultant. (*Hurwitz, supra*, 122

Cal.App.4th at p. 852.)  The appellate court explained that "[t]here is a central flaw in [the city's] theory.  It assumes that local public entity determinations of nuisance are absolutely immune from judicial scrutiny, such that even a transparently flimsy, transparently *pretextual* finding of nuisance would be enough to immunize the entity from any obligation to pay compensation.  [¶]  That is simply too broad a model of nuisance law.  And, if there ever was a case where a city's finding of 'nuisance' could be found by a trial court to be pretextual (as a cover for the substantive taking of property, or as here, a property right), this is it. . . .  [T]he sequence [of events] shows that the city was not using its police power to abate a nuisance.  Rather, it was trying to use its power to abate nuisances as a fig leaf to hide the rather naked expropriation of an existing property right." (*Id.* at pp. 852-853.)

In the present case, City did not unlawfully declare a nuisance, without proper notice, after it had already unilaterally abated it, as a pretext to avoid having to compensate the D'Egidios.  Instead, City brought an action asking the *court* to declare the billboard a public nuisance, and the trial court did so.  Therefore, the trial court properly awarded City attorney fees on its nuisance claim.

//

//

//

//

//

//

//

28

## DISPOSITION

The judgment and order awarding attorney fees are affirmed. City shall recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, Acting P. J.


We concur:



MANELLA, J.



COLLINS, J.